IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 1, 2008

## CATHERINE SMITH BOWLING, ET AL. V. TODD JONES, ET AL.

**Appeal from the Circuit Court for Anderson County**
**No. A4LA0513    Donald R. Elledge, Judge**

---

**No. E2007-01581-COA-R3-CV  - FILED MAY 16, 2008**

---

Plaintiff homeowners sued defendant residential building contractors for breach of a home construction contract upon allegations of defective workmanship and abandonment of contract. The trial court entered judgment in favor of plaintiffs and awarded actual damages in an amount based upon the finding that the house was of no value. The trial court also awarded damages under the Tennessee Consumer Protection Act upon a finding that the defendants violated the Act by willfully and knowingly misrepresenting that they were bonded. Upon appeal, we find no error in the judgment of the trial court, and accordingly, the judgment is affirmed in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Cause Remanded**

SHARON G. LEE, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Brian J. Hunt, Clinton, Tennessee, for the appellants, Todd Jones, Terry Jones, and Jerry Jones.

Robert W. Wilkinson, Oak Ridge, Tennessee, for the appellees, Catherine Smith Bowling, Beverly K. Anderson, Lynn Curtis Anderson, and Kimberly K. Anderson.

## OPINION

### I. Background

At some time in the fall of 2002, Catherine Smith Bowling, Beverly K. Anderson, Lynn Curtis Anderson, and Kimberly K. Anderson (hereinafter "the Andersons") entered into a contract with residential building contractors Todd Jones, Terry Jones, and Jerry Jones d/b/a Jones Brothers Constructions (hereinafter "the Jones brothers") for the construction of a home on Brooks Gap Road

in Anderson County. The home was to be built as a residence for Beverly K. Anderson and her husband, Lynn Curtis Anderson, who are the daughter and son-in-law of Catherine Smith Bowling, owner of the property upon which the home would be constructed. Kimberly K. Anderson is the daughter of Mr. and Mrs. Anderson and assisted in financial administration of the contract. The contract provided that the home would be constructed according to agreed upon plans and would be substantially completed within 180 days of the commencement date of October 1, 2002. The contract further provided that the house would be constructed at a total cost of $125,864.70, to be paid in installments consisting of $30,000 at commencement; two intermediate payments of $17,000 and $40,000, contingent upon specified elements of the house having been completed; and a final payment upon completion of construction. At the time of contract, the Jones brothers represented to the Andersons that they were licensed, bonded, and insured.

Construction of the home began as contracted on October 1, 2002, at which time the Andersons paid the Jones brothers an initial progress payment of $30,000. Some of the construction work was performed by the Jones brothers personally, and some of the work, such as roofing and block laying, the Jones brothers contracted out to others. Work on the house progressed through the fall; however, work slowed during December, due to inclement weather and a death in the Jones family. The Andersons paid the Jones brothers a draw of $6,000 in December and an additional draw of $38,000 in January of 2003.

As construction continued, disputes arose between the parties over the rate of progress and methods of construction employed and about whether the draws paid were being properly spent. Mr. Anderson came to the construction site daily, and his testimony indicates that he was frequently critical of the work being performed. By the summer of 2003, the house was framed and roofed; drywall had been hung; the walls had been painted; cabinets and hardwood flooring had been installed; and a portion of the plumbing and electrical work had been finished. However, construction was still not substantially complete. Around the first of July 2003, a dispute arose between the Jones brothers and Mr. Anderson as to the proper means and method of waterproofing the block walls of the house, and this dispute culminated in the Jones brothers leaving the construction site and ending further construction efforts. By this time, the Andersons had expended funds for labor and materials in the total amount of $95,485.47.

In July of 2004, the Andersons filed suit against the Jones brothers in the Anderson County Circuit Court. Inter alia, the complaint alleged that the Jones brothers discontinued work on the house without just cause and that since that time, the Andersons observed a multitude of structural defects in the house, including cracks in the walls and concrete floor, and sagging and bowing along the first level floor, and that these defects are so serious that the house "cannot [be] safely finished" and "will have to be removed." The complaint included charges that the Jones brothers misrepresented that they were licensed and bonded and breached their duty under the contract to perform their contractual duties in a workmanlike manner by,

(a) constructing a house not properly placed upon the foundation;
(b) constructing a house with improper trusses resulting in sags and

2

compression of the house and in the floors of the house;

(c) improperly reinforcing concrete block walls;

(d) failing to properly supervise workers.

The complaint sought damages against the Jones brothers for breach of contract and treble damages for violation of the Tennessee Consumer Protection Act.

The Jones brothers filed an answer and counterclaim to the complaint, denying the noted allegations and charging, inter alia, that the Andersons breached the contract by "refusing to pay [the Jones brothers] monies due them under the contract as construction on the home progressed and for ultimately firing them."

The case was tried without a jury, after which the trial court granted the Andersons a judgment in the amount of $95,485.47, as compensation for monies spent in constructing the house, upon a finding that the house was of no value in its present condition. The judgment further provides that "the Defendants have violated certain provisions of the Tennessee Consumer Protection Act and that the Plaintiffs shall recover against the Defendants $7,500 in punitive damages, and that further the Plaintiffs shall recover their reasonable attorney fees." The Jones brothers appeal this judgment.

## II. Issues

The following issues are presented for our review:

1) Whether the evidence preponderates against a conclusion that the Jones brothers breached the contract because of defective workmanship.

2) Whether the evidence preponderates against the conclusion that the Jones brothers breached the contract by abandonment.

3) Whether the Jones brothers were liable for the negligence of their subcontractors.

4) Whether the trial court erred in its award of damages.

## III. Analysis

### A. Standard of Review

In a non-jury case such as this one, we review the record de novo with a presumption of correctness as to the trial court's determination of facts, and we must honor those findings unless the evidence preponderates to the contrary. Tenn. R. App. P. 13(d); *Union Carbide v. Huddleston,* 854 S.W.2d 87, 91 (Tenn. 1993). When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to either as to the trial court's factual findings. *Seals v. England/Corsair Upholstery Mfg. Co., Inc.,* 984 S.W.2d 912, 915 (Tenn. 1999). The trial court's conclusions of law are reviewed de

3

novo and are accorded no presumption of correctness. *Campbell v. Florida Steel Corp.,* 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett,* 860 S.W.2d 857, 859 (Tenn. 1993).

## B. Defective Workmanship

We first address the Jones brothers' argument that the evidence preponderates against the trial court's conclusion that they breached the contract because they failed to construct the house in a workmanlike manner.

It is well settled that a contract for the construction of a building carries implied warranties against defects and that the construction will be accomplished in a workmanlike manner:

> A contract to construct an entire building is essentially a contract for material and labor, and includes an implied warranty protecting the owner from defective construction. Once a builder undertakes a construction contract, the common law imposes upon him or her a duty to perform the work in a workmanlike manner, and there is an implied agreement that the building or work performed will be sufficient for the particular purpose desired or to accomplish a certain result. Thus, a failure to perform a building contract in a workmanlike manner constitutes a breach of the contract.

13 AM. JUR. 2d *Building and Construction Contracts* §10 (2000). As set forth below, the record in this case is rife with evidence that the Andersons' house is filled with numerous serious defects as a result of the construction not having been performed in a workmanlike manner.

First, we note the testimony of Mr. Anderson, who is himself a professional mason and carpenter. Mr. Anderson was present at the construction site on a daily basis and testified based upon his experience in building and observations he made during and after construction. He attested that in July of 2003, when the Jones stopped work, there was water coming into the basement through the wall block that had not been waterproofed and that since that time, cracks have formed in the walls and basement floor, which is sinking in the front area of the house. Looking at a photograph of the south wall of the house, Mr. Anderson further testified as follows:

> Q. Mr. Anderson, let me show you exhibit number eleven and what are we looking at?
>
> A. We are looking at the south wall of the house. And it shows daylight coming through and this crack continues to the floor line.
>
> Q. Daylight coming through what?
>
> A. Through the block.

4

Q. Has this developed since June of 2003?

A. It has. This is one of the things I asked [Jerry Jones] to get his bonding company out there about.

Q. Has that crack increased in size?

A. Yes, it has.

Q. Do you see light coming through that crack?

A. Yes.

Q. What does that foundation wall do? What is the purpose of that wall?

A. It supports the whole house. This crack comes down and attaches to the window and at this point of the window it goes to the floor. So it goes to the weakest point all the way to the foundation, which indicates the foundation is weakened.

Q. Are there other cracks in the foundation walls of the house?

A. Yes, there is another crack one hundred eighty degrees from this crack, which is a little bit larger; and there's cracks in this front window here, there's a crack at the beginning of the corner and goes all the way to the foundation.

Q. If you have got a crack a hundred and eighty degrees opposite, is that the north wall of the house?

A. North wall of the house.

Q. And through that crack, can you see daylight?

A. Yes, you can.

Q. Is it changing in size?

A. It is.

Q. Does the basement floor have cracks in the floor?

5

A. It is cracked in several places.  It is cracked all over.

Mr. Anderson also testified that, although the plans for the house called for support posts in the basement, the Jones brothers elected to install trusses instead.  Mr. Anderson attested that these trusses should have been installed under the load bearing walls of the house, but they were not.  He also testified that the floors of the house are sagging – "the floors are sagging and they shake when you are in the middle of the great room.  If you walk across the room it vibrates the whole house."  Mr. Anderson also testified that much of the house is out of square, sheetrock has separated and caused the drywall to crack at the roof, the roof leaks, and water coming through the roof has caused extensive damage to the house's hardwood floors.  In summary, Mr. Anderson testified as to his observations regarding the general condition of the house as follows:

Q. Do you have any concerns about the structure of the house today?

A. Yes, sir, the house is so shaky inside and so much stress on every joint that it continues to lean further all the time.

. . .

Q. Just in that broad picture, what are you saying is wrong with the house?  What is happening there?

A. The front foundation is giving way from the back of the house and the weight of the house is just bringing it down.  Those load bearing walls in the center are causing it to concave and the house is in total distress now.

Mr. Anderson's testimony was, in important part, corroborated by the testimony of Randy Davis, a brick layer who was employed by the Jones brothers during construction of the house:

Q. Were there . . . walls that you observed that you could see were not plumb or square with the floor?

A. Yes, sir.

Q. Many walls or few walls?

A. Many walls.

Q. What did it feel like to walk across the floor in the house?

A. Humps and bumps that's got dips and part of it is lower that the other side.

6

Q. In the basement of the house, did you go into the basement?

A. Yes, sir.

Q. What did you observe in the basement?

A. In the basement I observed that there is cracks running down the walls.

Q. The block walls?

A. Yes, sir. There's cracks running across the floors. And I observed that the cause of this problem is the main walls that holds the weight of this type of house is setting on the subfloor and nothing in under them.

Q. Are there trusses in the basement spanning the distance?

A. Yes.

Q. Are there trusses under the load bearing walls?

A. No, sir.

All of this testimony and other evidence in the record, including photographic evidence, of defects throughout the house, supports the trial court's ruling that the Jones brothers breached the contract by failing to construct the house in a workmanlike manner, and the evidence does not preponderate against this finding.

### B. Abandonment of Contract

The abandonment of a contract gives rise to a cause of action for breach. *Gillespie v. Broadway Nat'l. Bank, et al.*, 68 S.W.2d 479, 482 (Tenn. 1934). In the instant matter, each party contends that the other abandoned the contract; the Andersons argue that the Jones brothers simply left the job and quit performing their duties under the contract, while the Jones brothers argue that the only reasons they did not complete their contractual duties were that the Andersons abandoned the contract first, by failing to continue to pay draws and purchase building materials and later, by firing them. Our review of the record shows that the evidence does not preponderate against the trial court's ruling in favor of the Andersons with respect to this issue.

As to the Jones brothers' allegations indicating that the Andersons ceased funding construction, we first note that the contract provided for the initial payment of $30,000; a second payment of $17,000 "for completion of all foundation work including footings masonry foundation

7

walls"; a third payment of $40,000 "for completion of all framing and rough-in of plumbing, electrical and HVAC components"; and a final payment of "the entire unpaid balance of the contract sum" for completion of construction. The record shows that the Jones brothers requested and were paid the initial draw of $30,000 in October of 2002. Thereafter, in December of 2002, they were paid $6,000, and in January of 2003, the Jones brothers requested and were paid a further draw of $38,000, even though, according to the testimony of Mr. Anderson, "they were nowhere near what they should have achieved" in order to be entitled to a draw under the contract at that time. Kimberly Anderson, who assumed responsibility for disbursement of funds under the contract, attested that after payment of the $38,000 draw in January of 2003, the only requests for funds by the Jones brothers for additional funds were a request for $2,000 later that month and a request for $300 in March of 2003 and that both of these amounts were paid when requested. Ms. Anderson further attested that as of June of 2003, she continued to disburse funds for the payment of subcontractors that the Jones had employed to assist in constructing the house. The evidence presented does not preponderate against the conclusion that funding for construction of the house continued until work ceased.

The Jones brothers also maintain that the Andersons abandoned the contract by terminating their employment. The Jones brothers left the site on or around July 4, 2003, when an argument arose between them and Mr. Anderson related to waterproofing the wall block, and the Jones brothers allege that Mrs. Anderson fired them at that time. However, both Mr. Anderson, Mrs. Anderson, and Kimberly Anderson all testified that the Jones brothers were never fired. Mr. Anderson testified that after the incident of July 4, he went to Jerry Jones's home to speak with the Jones brothers, and they advised him that they were not coming back. Kimberly Anderson testified that shortly thereafter that same month, she met with the Jones brothers and discussed problems with the house and insurance matters and they advised her that they would be returning to continue construction, but that they never did so. Her testimony was corroborated by the Jones brothers' subcontractor Randy Davis, who overheard discussions at the meeting and testified as follows:

> Q. What did you hear the Jones brothers say?
>
> A. Well, I heard them say that where the back roof was sagging they said that they was going to, let's see, how exactly they put that. They was going to overlay some shingles to cover up where the roof is sagging and then the last thing I heard them say is our insurance company, and they asked about the insurance company, and then the Jones brothers left.
>
> Q. Did you hear them say we are not coming back to the job?
>
> A. No.
>
> Q. Did you hear [Kimberly Anderson] say you are not to come back to the job?

A. No.

Even the testimony of Terry Jones belies the Jones brothers' allegation that they did not return to the job because they were fired by Mrs. Anderson:

> Q. When you met with [Kimberly Anderson], you were going to get
> the job done? That was the reason you met. You wanted to get this
> job done.
>
> A. If she had gave us another draw we would have probably finished
> the house up because that is what type guys we are.

The Jones brothers' allegation that they were fired is obviously inconsistent with Terry Jones's testimony that they would have finished the house if they had been given more money. If the Jones brothers truly believed they had been fired, it does not make sense that they would, at the same time, believe that they had the option of finishing the house. Finally, in support of their argument that they were fired, the Jones brothers note that Mrs. Anderson testified that she was also present at the meeting between the Jones brothers and Kimberly Anderson and that Mrs. Anderson attested that at that time, the Jones brothers' told her that she had fired them. The Jones brothers apparently insist that Mrs. Anderson's testimony in this regard is consistent with their own testimony that they were fired. In fact, such testimony only confirms that the Jones brothers alleged that they were fired, and it does not confirm that they were fired in fact or that Mrs. Anderson agreed that they were fired.

Based upon our review of the record, we find no merit in the Jones brothers' argument that the evidence preponderates against the conclusion that they, not the Andersons, breached the contract by abandonment.

### C. Liability of Subcontractors

Next, the Jones brothers contend that they were improperly held liable for what was actually the defective workmanship of various subcontractors they hired to assist in construction of the house. In their appellate brief, the Jones brothers "contend that the subcontractors used in construction of the home were that of independent contractor status and therefore [the Jones brothers] were not ordinarily liable for the negligence of an independent contractor." Apparently, the Jones brothers argue that if there were problems with the work performed by the individuals they employed, the Andersons recourse is to sue those individuals, and the Jones brothers themselves are not contractually liable. We find no merit in this argument. The Jones brothers had a contractual duty to construct the house to completion and to perform the construction in a workmanlike manner. Their unilateral delegation of work to third parties did not absolve them of this duty. In any event, the record does not show that this issue was ever raised in the court below, and accordingly, it is waived. As a general matter, "questions not raised in the trial court will not be entertained on appeal." *City of Cookeville ex rel. Cookeville Reg'l. Med. Ctr. v. Humphrey*, 126 S.W.3d 897, 905-06 (Tenn. 2004).

9

### D. Damages

The Jones brothers contest the trial court's award of damages on two grounds; first, they contend that the trial court erred by basing its award of compensatory damages upon a finding that the house as constructed was of no value and second, they contend that the trial court erred in awarding "punitive" damages for knowing and willful violation of the Tennessee Consumer Protection Act ("TCPA").

In support of their argument that the trial court improperly awarded damages based upon a finding that the house was of no value, the Jones brothers contend that there was no proof presented to support such finding or that defects in the house could not be repaired. They assert that the proper measure of damages when a contractor fails to complete a construction project is the difference between the contract price and the cost of finishing the work according to the contract, citing *Harley v. Harrison*, No. M2005-02099-COA-R3-CV, 2006 WL 2644372, at *3 (Tenn. Ct. App. M.S., filed Sept. 13, 2006.)

The trial court stated its determinations regarding the basis for its award of compensatory damages as follows:

> I find that this house can't be corrected. When if you have got a foundation problem where the walls are cracked all the way through beginning with the foundation and you've got leaking from the roof all the way down through the walls down, you've got holes and cracks in other walls, I just don't see, honestly, without taking it down, I don't know how you could repair it.

We believe these conclusions of the trial court were adequately supported by the evidence, including the following testimony of Mr. Anderson:

> Q. Mr. Anderson, do you have an opinion as to the value of your house in its present condition?
>
> A. In its present condition it is a minus value.
>
> Q. Why do you say that, sir?
>
> A. Because no one would undertake completing the house. No other contractor would put a crew in it. It is going to have to be removed before I can build another house. It is not a restoration. They were provided new materials to build this house with and I expected a new house.
>
> Q. What have you received for the ninety-five thousand dollars that

10

has directly been paid out toward the construction of the house? What have you got today?

A. Nothing of any benefit to me. I don't have a house or nothing even close to being habitated.

Kimberly Anderson, who has degrees in industrial and environmental engineering, also testified as co-owner of the house and based upon her experience as an engineer as follows:

Q. As an engineer . . . and . . . in you opinion as an owner, does this house have any value?

A. No, sir.

Q. Why not?

A. In order for it to be livable it would probably have to be completely removed and built from scratch again. And I also, to be certain, pulled in a structural engineer.

. . .

Q. . . . [H]ave you inquired or attempted to find someone to work on this house?

A. Yes.

Q. . . . [H]ave you been able to find anyone that will work on this house?

A. No.

Q. In your opinion, is the house a safety hazard?

A. Yes.

Q. Why?

A. The walls could fall down. The foundation is unstable. You can feel vibrations when you walk through the home.

Finally, Mrs. Anderson also testified that in her opinion the house has no value.

11

It is well settled that an owner of property is competent to testify to the value of such property. *Stinson v. Stinson*, 161 S.W.3d 438, 446 (Tenn. Ct. App. 2004). Given the above referenced testimony of the owners and other evidence confirming the house's structural instability, we believe the trial court's determination that the house is of zero value is well supported, and we do not find that the evidence preponderates otherwise.

In addition to awarding the Andersons compensatory damages in the amount of $95,485.47, the trial court awarded them punitive damages in the amount of $7500 upon its finding that the Jones brothers violated the TCPA, codified at Tenn. Code Ann. § 47-18-101, et seq., which provides as follows:

> Any person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages.

Tenn. Code Ann. § 47-18-109(a)(1). Upon its finding that the TCPA has been violated, a trial court is authorized to award the plaintiff reasonable attorney's fees, *id.* at (e)(1), and the TCPA further provides that a trial court "may award three (3) times the actual damages sustained" upon a finding that the defendant's violation of the TCPA was "willful or knowing," *id.* at (a)(3). In the instant matter, the trial court found that the Jones brothers violated the TCPA by falsely representing to the Andersons that they were bonded when in fact, they were not. Although the trial court also determined that this violation was willful and knowing, it did not grant the Andersons an award of treble damages, as it was authorized to do under the statute, but instead, awarded damages in the significantly lesser amount of $7,500, as was its discretion. *See **Keith v. Howerton***, No. E2002-00704-COA-R3-CV, 2002 WL 31840683 at *3 (Tenn. Ct. App. E.S., filed Dec. 19, 2002) (upon a finding of willful violation of the TCPA, a trial court may award less than treble damages under appropriate circumstances).

The Jones brothers contend that insufficient evidence was presented to support the trial court's finding that their violation of the TCPA was willful and knowing. They do not deny that they were not bonded, nor do they deny that they misrepresented to the Andersons that they were bonded and that the Andersons relied upon this misrepresentation. However, the Jones brothers insist that such misrepresentation was unintentional and that the record does not show otherwise. We disagree.

First, we note Jerry Jones's own testimony that prior to their employment by the Andersons, he gave Kimberly Anderson the Jones brothers' business card, a copy of which is in the record before us. Among other things, this card states that the Jones brothers are "Licensed, Insured, and *Bonded*." (Emphasis added). Jerry Jones's testimony indicates that although he knew at the time that the bonding information on the card was inaccurate, he did not inform Kimberly Anderson of this and instead, merely advised her that the telephone numbers on the card were incorrect:

Q. [Y]ou gave her your card?

A. Yes.

Q. That says you are bonded?

A. I told her the card was a mistake.  That I'll re-write the numbers on it so you can have our numbers to contact us.

Q. The mistakes you were telling her was the phone numbers, isn't that right?

A. Yes.

Q. You didn't say anything about the bond or lack of a bond being a mistake?

A. I didn't say anything about even any insurance at the time.

We believe that under circumstances wherein the card's inaccuracies were the subject of discussion, it would have been natural to apprise the customer that the bonding information was inaccurate given the importance of that information. We believe the fact that this was not done is indicative of an intent to deceive.  However, more direct proof that the Jones brothers intentionally concealed the fact that they were not bonded is provided by the following testimony of Kimberly Anderson:

Q. . . . You received the [Jones brothers's business] card at the beginning of the negotiations?

A. Yes.

Q. Did you believe them to be bonded?

A. Yes.

Q. Did you ask them if they were bonded?

A. Yes.

Q. Tell me who said what.

A. *I believe it was both Terry and Jerry said that they were licensed, bonded and insured.  And Todd later discussed it in a January meeting that they were licensed and bonded.*

13

A. Would you have entered into this contract if you knew they were not bonded?

Q. Absolutely not.

(Emphasis added).

Mr. Anderson's testimony also indicates that the Jones brothers intentionally concealed the fact that they were not bonded:

> Q. Did you ever ask the Jones brothers to see any documentation about a bond or their bond?
>
> A. Yes, I did. When a crack formed in the north wall of the house and I saw that the house was separating, I told Jerry [Jones], I said, we are going to have to take care of this. He said, our insurance will cover this. Just wait. No, I said, you need your bonding company on this, this is bigger than a slight crack in the house, the foundation is giving way.
>
> Q. Did he produce a bond or any documentation?
>
> A. Oh, we will get with it, we'll get with it. He would always say that and then it would be passed to other ones to make an excuse.
>
> Q. Did you ever receive a bond?
>
> A. No, sir, I didn't.

All of the above cited testimony constitutes sufficient evidence to support the conclusion that the Jones brothers's violation of the TCPA was willful and knowing, and their argument to the contrary is of no merit.

The Jones brothers next contend that even if there was a violation of the TCPA, the trial court erred in awarding punitive damages because an award of punitive damages is precluded under the TCPA. In support of this argument, the Jones brothers cite *Paty v. Herb Adcox Chevrolet Co.*, 756 S.W.2d 697 (Tenn. Ct. App. 1988), wherein we denied that the TCPA allows for an award of punitive damages. Noting that the TCPA allows a plaintiff to recover "actual damages," which may be trebled upon a finding of a willful and knowing violation, we stated as follows:

> We think that the legislature's restricting recovery to "actual damages" precludes the award of any other damages including punitive damages. As further evidence of the legislative intent to

14

restrict recovery to "actual damages" as opposed to punitive damages is the provision that if the court finds the defendant's acts were "willful or knowing violation" of the statute, "the court may award three (3) times the actual damages sustained."

*Id.* at 699.

While ***Paty*** does provide that an award of punitive damages per se is precluded under the TCPA, in ***Killingsworth v. Ted Russell Ford, Inc.***, 205 S.W.3d 406 (Tenn. 2006) our own Supreme Court indicated in dicta that the treble damages allowed under the TCPA are punitive damages. Noting the right of a plaintiff to collect actual damages and treble damages under the respective statutory subsections (a)(1) and (e)(1), the Supreme Court stated that "[i]n addition to actual *and punitive damages*, the TCPA provides that . . . the court may . . . award reasonable attorney's fees . . . ." ***Id.*** at 409.

In any event, it is clear from the record in the instant matter that, however termed by the trial court, the $7,500 damage award at issue was an award within the purview of the treble damage award allowed under subsection (e)(1) and intended as such. This is evident from the following discourse at the conclusion of trial between the trial court and the Andersons' attorney, James Webster and the Jones brothers's attorney, Brian Hunt:

> THE COURT: My question is treble damages [under the TCPA] is not mandatory, is it an amount up to treble damages?
>
> MR. WEBSTER: I agree, Your Honor. It is up to the Court's discretion but not to exceed triple. Although, I had a general sessions judge in Knox County, I thought he was wrong, told me it was mandatory you had to triple.
>
> THE COURT: That is why I've asked that. I have had judges tell me that before, but I'm sure if, in fact, I award damages under the Consumer Protection Act, Mr. Hunt wouldn't object if it was less than treble damages.
>
> MR. HUNT: I wouldn't. But I would ask the Court not to award treble damages or anything up to that.
>
> . . .
>
> THE COURT: . . . I'm not going to give treble damages. I'm going to award an amount of money that I think would be sufficient to remove the home and I'm doing it as punishment under the Consumer Protection Act. . . . . In terms of removing the home . . ., I'm going

15

to award this as a punitive damage in the amount of seventy-five hundred dollars.

While the trial court refers to the award of $7,500 as a punishment, at the same time it indicates that this award is to compensate the Andersons for the cost of removing the house. Notwithstanding the trial court's designation of the award, we believe it is clear from the record that the $7,500 award under the TCPA was properly awarded pursuant to subsection (e)(1) of the TCPA in lieu of an award of treble damages and to the extent that the trial court erred in designating this award to be an award of "punitive" damages, such error was harmless.

In sum, we find the trial court's award of damages in this case was proper, both as to the $95,485.47 awarded for monies spent by the Andersons in constructing the house and the $7,500 awarded under the TCPA.

### IV. Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed. Costs of appeal are assessed to the appellants, Todd Jones, Terry Jones, and Jerry Jones.

_____
SHARON G. LEE, JUDGE

16