IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 19, 2013 Session

# RALEIGH COURT CONDOMINIUMS, HOMEOWNERS' ASSOCIATION, INC. v. E. DOYLE JOHNSON CONSTRUCTION CO., ET AL.

**Appeal from the Circuit Court for Knox County**
**No. 2-4-40408     Harold Wimberly, Judge**

**No. E2012-02474-COA-R3-CV-FILED-AUGUST 29, 2013**

Homeowners' association filed suit against general contractor because of drainage issues alleging fraud, negligent misrepresentation, negligence, violations of the Tennessee Consumer Protection Act, and breach of the implied warranty of "good and workmanlike" construction. The trial court found in favor of homeowners' association. The general contractor appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and D. MICHAEL SWINEY, J., joined.

Arthur F. Knight, III, Knoxville, Tennessee, for the appellant, E. Doyle Johnson Construction Co.

Mark E. Brown, Knoxville, Tennessee, for the appellee, Raleigh Court Condominiums Homeowners' Association, Inc.

## OPINION

## I. BACKGROUND

The plaintiff, Raleigh Court Condominiums Homeowners' Association, Inc. ("HOA" or "Raleigh Court") filed the complaint initiating this case in September 2008, against the defendants, E. Doyle Johnson Construction Company and E. Doyle Johnson, individually (collectively, "Johnson"). HOA alleged in relevant part as follows:

11. During construction on Raleigh Court Condominiums, certain members of the Raleigh Court HOA noticed a drainage problem between the units located on Graham Way and Greensboro Way and the units between Greensboro Way and High Point Way. The drainage plan developed and subsequently constructed by the Defendants was inadequate which caused standing water to collect in the common areas between the units and threaten both property values and the health, safety and welfare of each unit owner and his or her family.

12. The members of the Raleigh Court HOA brought the drainage and resulting flooding problems to the attention of the Defendants. In response, the Defendants made an affirmative representation to the members of the Raleigh Court HOA that the drainage and flooding problems would be repaired prior to the Defendants turning the development over to the Raleigh Court HOA.

13. On July 26, 2006, the Defendants turned over the development to the Raleigh Court HOA. However, the Defendants had not corrected the problem as represented.

14. The members of the Raleigh Court HOA brought the continuing problem to the attention of the Defendant E. Doyle Johnson at the meeting where the development was turned over to the Raleigh Court HOA. The Defendant Johnson affirmatively represented to the members of the Raleigh Court HOA, both individually and in his capacity as the President of E. Doyle Johnson Construction Co., that the drainage and flooding problems would be repaired at the Defendants' expense within thirty (30) days.

15. The Defendants refused and failed to repair the drainage and flooding problems within thirty (30) days of the July 26, 2006 meeting.

16. On January 11, 2008, the Defendants turned over ownership of the common elements at Raleigh Court to the Raleigh Court HOA by executing a Quitclaim Deed in favor of Raleigh Court HOA. . . .

17. The drainage and flooding problems were not corrected by the time the Quitclaim Deed was executed by the Defendants on January 11, 2008.

18. As a result of the Defendants' failure to repair the drainage and

flooding problems at Raleigh Court, the members of the Raleigh Court HOA have been forced to contract for the repair of the problem at a cost of Forty Thousand Dollars ($40,000).

HOA's complaint alleged negligence, fraud, negligent misrepresentation, violations of the Tennessee Consumer Protection Act, and breach of the implied warranty of good and workmanlike construction. HOA requested compensatory damages in the amount of $40,000, treble damages under the Tennessee Consumer Protection Act, attorney fees and costs, punitive damages, and general relief.

At trial, Sherri Fauver, a former resident, described the conditions at Raleigh Court prior to her purchase:

Q: . . . [W]hen you looked at the unit, notice any particular problems in the back?

A: Yes, there was water drainage that just sat on top of the ground.

Q: Where would that have been located?

A: In the back of my unit. It faced the back of the units behind me. It was in between the units.

Q: Who did you purchase this [unit] from?

A: Doyle Johnson.

Q: Before purchasing your unit, did you have a discussion with him about the water you saw in the back?

A: I never had a discussion with him, but I put it in my contract that he had to remedy the drainage issue?

* * *

Q: Was Mr. Johnson at the closing, by chance?

A: He was.

Q: Was there anything in your contract about drainage?

-3-

A:    There is.

Q:    Where is that, if you could find that?

A:    It's on page six of seven of the contract, under special stipulations number two.

Q:    What does that say?

A:    "Water drainage between dwellings to be remedied prior to turnover to homeowners' association."

John Mayes, a current homeowner, testified as follows regarding the drainage problems:

A:    We live in actually the lowest spot of the whole place, I reckon, and the water will come and stand behind our deck – or not deck, but the fence, and when the water is really running it would run down between our condo and the one next door and stand in our front yard, all back through there and all back around behind the condos.

* * *

Q:    The water you talked about being near your unit, what kind of problems, if any, did it cause you?

A:    We have a slab. We don't have a deck, and my wife put down the big concrete pavers and the pea gravel all around those and everything, and the pavers would actually float in the water, it was standing so high back behind our – even when it was dry, then they'd still squish until it hadn't rained for a month, so you couldn't even use the back back there.

Homeowner Winfred Douglas related:

Q:    Now, when you moved in at your unit a few years ago, what did you observe with respect to water at Raleigh Court?

A:    We had standing water in the back.

-4-

                                    * * *

Q:    There are, it looks like [in these pictures] – did you put yardsticks out here [in the back of the unit]?

A:    Yes.

Q:    Why did you do that, sir?

A:    To measure the standing water.


Mark Goins, another resident, observed that while he was at Raleigh Court, "across the road from us the water stood pretty constant." His wife, Debbie Goins, related that she saw "[s]tanding water, the drains were below or above grade, cracks in the foundation beginning, just a mess." Homeowner Ellarece Bradley described her experience with the drainage issues and the representations made by Johnson:

Q:    Did you notice anything specifically outside of your unit when you looked at it?

A:    The day that we looked at the unit you could not walk in the backyard unless you had on boots because it was so muddy.

                                    * * *

Q:    Was Mr. Johnson at your closing, by any chance?

A:    Yes, he was.

Q:    And at your closing, when Mr. Johnson was there, did you have an opportunity to talk to him about drainage issues?

A:    Yes, I did.

Q:    Tell me what he said to you.

A:    Before we signed the documents we – actually it was my husband asked Mr. Johnson if he knew there was a drainage problem. He said yes. He said do you plan to correct the problem? He said yes. Both men stood

up. Mr. Johnson shook my husband's hand, and he said I will definitely fix the problem for you.

Q:     Based on that statement, did you still close on the condo that day?

A:     Yes, I did.

Q:     Why did you do that if there was a drainage problem in the back of the unit?

A:     I took this man to be an honest man. He had several developments over the city, and I took him at his word.

* * *

Q:     After you moved in, was there ever an occasion where you observed any issues with water?

* * *

A:     Every day the ground was wet. I have a deck and underneath my deck the water was standing and around the deck area, it was nothing but mud.

Q:     Now, would this occur when it wasn't raining also?

A:     Yes.

On June 28, 2006, the first meeting of HOA was held. Johnson was present. Minutes from the meeting reflect that in response to a number of owners voicing concerns about drainage problems, Johnson stated that he was aware of the problem and that it would be fixed within 30 days. On July 26, 2006, a meeting was held to turn over operation of the condominiums to the homeowners. Ms. Fauver related her recollection of the meeting:

Q:     So what happened at that meeting?

A:     That's the night [Johnson] turned over the homeowners association to us.

Q:     Did he say – was he asked about drainage?

A:     He was.

Q:     Did he say anything specifically?

A:     He said that he was aware of the problem and he was going to fix it at his expense and it would be fixed within the next 30 days.

In regard to the July 2006 meeting, Mr. Mayes recalled that Johnson "stood up and told us that [turning over the condominiums] was the reason he was there and that he knew there was a problem with the water drainage and it would be taken care of. He wasn't taking any questions or anything and he took off out the door." Mr. Goins observed that Johnson "came in and stated that he was turning over the condo[s] to the association and that he would not take any questions in the meeting. A lady that was there kept bringing up, asking when he was going to fix the water issues . . . and he stated that he would take care of it." Ms. Goins added:

Q:     What happened at that meeting?

A:     My husband and I were there at the meeting in Fountain City when the condo association was turned over to us. Doyle Johnson was late. He came in with a lady and they had a couple, two or three boxes. They came in and the first words out of his mouth were hello, I'm Doyle Johnson, the purpose of this meeting is to turn it over to the homeowners association, there will be no questions, and that was it. There was people that were standing up saying what about the drainage, what about the water?

* * *

Q:     Was there ever any – did he ever mention anything about any drainage problems that you recall, Mr. Johnson?

A:     In the meeting there were women that were asking him about the drainage issues, when they were going to be resolved, and his reply was he would resolve it within 30 days.

The record reveals, however, that the drainage problems were never resolved by Johnson. Ms. Fauver testified again as follows:

-7-

Q:     After the July 26th meeting that we're talking about here in 2006, did you continue to observe water problems in the back of your unit?

A:     I did.

Q:     Did you contact Mr. Johnson about those?

A:     I did.

Ms. Fauver related that she wrote a letter to Johnson because of the continuing drainage issues behind her unit. She received a response from Johnson on February 7, 2007, in which she was assured the water problems would be addressed. Her testimony continued as follows:

Q:     After you received this letter of February 2007, did you continue to observe water problems in the back?

A:     I did.

Q:     Did you contact Mr. Johnson again?

A:     I did.

* * *

Q:     Did you ever receive any response to this letter?

A:     No.

Q:     Did you ever make any complaints to the city about this issue?

A:     Yes.

Q:     Okay. Do you recall who you talked to with the city?

A:     Curtis Williams.

* * *

Q:     Did you ever observe Mr. Johnson's company doing any work on the

-8-

water problems in the back of your unit?

A:  They came and put some rock underneath our deck and some soil, but it was just underneath the decks. There wasn't nothing between the units.

Consistent with Ms. Fauver's testimony, an email from Mr. Williams dated April 13, 2007, is found of record:

FYI, I spoke to a lady named Sherry Satterfield [Fauver] . . . about some drainage issues in Raleigh Court Condo's (sic). She is having a problem with the drainage behind her lot which is also an area that is behind a condo that is accessed off of another street parallel to hers. She says water ponds up and does not run off. She has written the developer and has received no corrective response. . . . The developer tried to tell her that he was waiting on the city to tell him how to fix it. From a phone conversation I had with Sherry a couple of weeks ago, I told her that the city does not perform "design" for developers. . . .

An inspection memorandum from Mr. Williams dated July 26, 2007, reflects that "[s]tanding water reported where homes back up to each other." Another such memorandum, dated August 8, 2007, again notes: "Standing water reported where homes back up to each other."

Ms. Fauver and Mrs. Bradley both testified that the drainage problems continued in 2008, 2009, and 2010. As a result of the continuing problems with ponding water, HOA hired Berry's Lawn Service and paid $40,000 to address the drainage concerns. According to all testimony at trial, the repairs by Mr. Berry resolved the drainage matter.

HOA's expert witness, engineer Ronald R. Corum, testified that every time he traveled to Raleigh Court prior to the work by Mr. Berry, he observed standing water. Mr. Corum related:

Q:  Did you, based on what you saw, form any opinions about . . . what was the problem with the standing water?

A:  Yeah, it wasn't going anywhere. It was there. It was just standing water.

Q:  . . . [W]hat was your opinion based on why the water was standing there?

A:     The reason why the water was standing there was because water runs downhill and there w[ere] no slopes in the rear of the homes, so there was nowhere to go.  It wasn't sloped away from the houses and it wasn't sloped away from the back yards . . . the reality, the water should be flowing away from the back yards and not sitting in the back yards.

* * *

Q:     Did you at any point, Mr. Corum, while you were at Raleigh Court, in formulating your opinions in this case, did you take a look at some space between units?

A:     Yes.

Q:     What did you observe there?

A:     Well, I observed that they were pretty close together.  Normally – well, I mean, it's not that it was wrong that it wasn't, they were too close together.  It's that the ground between the two buildings w[as] flat, and they really didn't have a swale or anything to drain the water away or even allow it to go into a ditch system of some sort to get away from the land.  It needed to get to the street so it could get into the storm water system.

* * *

Q:     Mr. Corum, based on your personal observations and review of photographs and other items that you used in this case, have you formed an opinion as to what the cause of the standing water was at Raleigh Court?

A:     Yes.

Q:     What is that opinion, sir?

A:     No conveyance system or no drainage system to carry the water away from the buildings.

Q:     By that you mean carry it where?

-10-

A:      Carry it to the pond, carry it to the street. Well, actually carry it to the street and then carry it to the ponds.

Mr. Williams, the city's storm water engineer, acknowledged at trial that issues regarding drainage existed at Raleigh Court and recalled that he alerted Mr. Campbell and Johnson about the problems:

Q:      Mr. Williams, did you ever personally receive any complaints from residents of Raleigh Court about water problems on the site?

A:      Yes, sir, I had received some phone calls from an individual at the development about ponding in the back yard.

Q:      What did you do in response?

A:      Tried to make the developer aware of it. We went out and took a look at the site. I know Steve Tokay went out probably on multiple occasions. I probably went out one or two times myself.

Q:      Now, did you personally ever tell Mr. Johnson how to correct the water problems at Raleigh Court?

A:      No, sir. That's typically not our job and not our – we're typically not allowed to tell folks how to do things.

Q:      Did you ever tell Mr. Johnson personally to, how to, or devise a plan for him to correct drainage problems?

A:      No, sir. We can't do design work for private developers.

Q:      Not a city function[,] is that correct?

A:      No, sir.

Johnson related that some low elevation spots at Raleigh Court were filled in and extra drains were installed. An e-mail response from Mr. Campbell, dated August 6, 2007, noted as follows: "Water does not appear to be standing 24 hours after a rain even per the enclosed pictures. Contractor has added gravel, etc. under decks as requested by City of Knoxville. Any further changes for this area can be done by contractor on as needed basis. . . ." Shortly thereafter, in early October 2007, the city released Johnson's performance bond on the

-11-

project. Johnson claimed at trial that after the performance bond was released, the company believed that the work at Raleigh Court was complete and that no more drainage problems existed. Johnson opined that once a performance bond is released, no more work could be done on a project without the city's permission.

On October 8, 2012, the trial court ruled in favor of HOA. In the final order entered on October 29, 2012, the court provided as follows:

1.    There was a drainage problem on the common elements between Greensboro Way and High Point Way and Greensboro Way and Graham Way at Raleigh Court condominiums;

2.    That the drainage problem existed prior to the turnover of the common elements from the Defendant E. Doyle Johnson Construction Company to the Raleigh Court Homeowners' Association, Inc.;

3.    That the drainage problem continued after the turnover of the common elements from the Defendant E. Doyle Johnson Construction Company to the Raleigh Court Homeowners' Association, Inc.;

4.    That the Defendant E. Doyle Johnson Construction Company agreed to correct the drainage on the common elements;

5.    That the Defendant E. Doyle Johnson Construction Company failed to correct the drainage problems as agreed;

6.    As the result of the Defendant's failure to correct the drainage problem, the Plaintiff was entitled to repair the problem;

That the Plaintiff spent a total of Forty Thousand Dollars ($40,000.00) to repair the drainage problems at Raleigh Court;

7.    That the Plaintiff is entitled to a judgment against the Defendant E. Doyle Johnson Construction Company in the amount of Forty Thousand Dollars ($40,000.00) representing the cost of the repairs;

8.    That the Defendant E. Doyle Johnson, individually acted at all times on behalf of the Defendant E. Doyle Johnson Construction Company and is not individually liable to the Plaintiff;

9.    The Plaintiff has not shown that it is entitled to either punitive damages or damages under the Tennessee Consumer Protection Act . . . .

## II.  ISSUES

We consolidate and restate the issues raised by Johnson in this appeal as follows:

1.    Whether the trial court erred in entering judgment against Johnson in any amount based upon the complaint filed in this cause because the evidence was insufficient.

2.    Whether Johnson can be found liable for an allegedly inadequate drainage system: (a) that Johnson did not design or develop; (b) that was expressly approved by the city; (c) that was designed by a third party; (d) after the city released the performance bond; and (e) that was accepted by HOA.

3.    Whether Johnson can be found liable for any damages when the amount sought is based on the work of an individual who did not follow required procedures.

## III.  STANDARD OF REVIEW

In this non-jury case, our standard of review is de novo upon the record of the trial court, accompanied by a presumption of the correctness of the factual findings unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Wright v. City of Knoxville,* 898 S.W.2d 177, 181 (Tenn. 1995).  The trial court's conclusions of law are reviewed de novo without a presumption of correctness. *See Taylor v. Fezell*, 158 S.W.3d 352, 357 (Tenn. 2005).

## IV.  DISCUSSION

Johnson asserts that the trial court based its judgment on findings that the company entered into an agreement to repair the drainage problems at Raleigh Court and then failed to do so.  According to Johnson, the court found that there was a breach of that agreement between the parties.  Johnson therefore argues that the court's findings do not conform to HOA's complaint, as there is no allegation for breach of any agreement between the parties,

and because HOA failed to move to amend its complaint to reflect such a cause of action. Johnson further contends that the proof at trial was insufficient to support a finding of liability in favor of HOA under any of the causes of action in the complaint: fraud, negligent misrepresentation, negligence, violation of the Tennessee Consumer Protection Act, and breach of implied warranty of good and workmanlike construction.

Tennessee "recognizes two distinct types of implied contracts; namely, contracts implied in fact and contracts implied in law, commonly referred to as quasi contracts." *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 154 (Tenn. 1966). Contracts implied in fact arise under circumstances which show mutual intent or assent to contract. *Weatherly v. American Agric. Chem. Co.*, 65 S.W.2d 592 (Tenn. Ct. App. 1933). Contracts implied in law are created by law without the assent of the party bound, on the basis that they are dictated by reason and justice. *Id.* A party seeking to recover on an implied in law or quasi contract theory must prove the following: "A benefit conferred upon the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." *Paschall's, Inc.*, 407 S.W.2d at 155. We find that the proof in this matter established both types of implied contracts, and that the trial court's findings conform to the allegation in HOA's complaint that Johnson breached a warranty, i.e., a covenant or promise, of workmanlike construction. *See Black's Law Dictionary* 1725 (9th ed. 2009).

In 2008, this court, in *Bowling v. Jones*, 300 S.W.3d 288, 291 (Tenn. Ct. App. 2008), held as follows:

> Once a builder undertakes a construction contract, the common law imposes upon him or her a duty to perform the work in a workmanlike manner, and there is an implied agreement that the building or work performed will be sufficient for the particular purpose desired or to accomplish a certain result. Thus, failure to perform a building contract in a workmanlike manner constitutes a breach of the contract.

*Id.* at 291 (quoting 13 Am. Jur.2d *Building and Construction Contracts* § 10 (2000)). Thus, Tennessee has recognized an implied contractual "duty" in construction cases – "a legal obligation that is owed or due to another"[1] – to perform in a workmanlike manner. *Federal Insur. Co. v. Winters*, No. E2009-02065-COA-R3-CV, 2010 WL 4065609, at *3 (Tenn. Ct. App. Oct. 18, 2010). Additionally, the Tennessee Supreme Court has recognized the general principle that individuals or business entities must answer for any deficiencies in the performance of services. *Federal Insur. Co. v. Winters*, 354 S.W.3d 287, 293 (Tenn. 2011).

---

[1]*Black's Law Dictionary* 580 (9th ed. 2009).

The record likewise establishes that the "New Construction Purchase and Sale" agreements used by Johnson and the HOA members reflected that "[t]he home shall be constructed in accordance with good building practices," and Johnson "warrant[ed] the Property against defective workmanship." The contract with Ms. Fauver specifically provided that "Water Drainage Between Dwellings to be Remedied Prior to Turn over to Home Owners Association." The "Master Deed" of the property reflects that Johnson provided:

> grantor makes no other implied or express warranties relating to the unit or the common areas and facilities, except for such warranties as are set forth in the general warranty deed to the unit.

Consistent with holding in *Bowling* therefore, once Johnson, as the general contractor, undertook the Raleigh Court project, the common law imposed a duty to ensure that the condominium community was completed in workmanlike fashion and that Johnson breached this duty by failing to remedy the problems with the drainage system.

HOA also alleges that Johnson was negligent in failing to make repairs to the drainage system. This claim requires proof of the following elements: (1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause. *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995). Johnson responds that the construction company cannot be held liable to HOA for the damages resulting from the ineffective drainage system because it was designed by a third-party, Robert Campbell & Associates, L.P., an engineering firm. According to Johnson, he hired Mr. Campbell's firm to draw the site plan and paid $43,033.44 for the work. Mr. Campbell acknowledges that he and his firm prepared the conceptual drawings and plans for the project and designed the drainage system.

The proof at trial revealed that there was a problem with the drainage system at Raleigh Court before Johnson executed on January 11, 2008, the quitclaim deed turning over control of the common elements to HOA. The drainage problem continued after the execution of the quitclaim deed. Regardless of who drew the plans for the drainage system, Johnson had notice of the standing water conditions and of the fact that the system did not work effectively. One may be held liable for negligent construction if one had notice. *See Blair v. West Town Mall*, 130 S.W.3d 761, 764 (Tenn. 2004). By showing Johnson had notice, HOA has established that Johnson had a duty to act reasonably to remedy the drainage problem. *Id.* at 766. The unilateral delegation of work to a third party did not absolve Johnson of his duty to perform in a workmanlike manner. *Bowling*, 300 S.W.3d at 295. It

is a "hornbook principle of contract law" that delegating "performance of a contract does not, unless the obligee agrees otherwise, discharge the liability of the delegating obligor . . . ." *Fed. Ins. Co.*, 354 S.W.3d at 294 (quoting *Brooks v. Hayes*, 395 N.W.2d 167, 169 (Wis. 1986)).

The evidence presented at trial also was sufficient to support HOA's allegations of fraud and/or negligent misrepresentation. Fraud contains four elements: (1) an intentional misrepresentation of material fact, (2) knowledge of the representation's falsity, and (3) an injury caused by reasonable reliance on the representation. *Axline v. Kutner*, 863 S.W.2d 421, 423 (Tenn. Ct. App. 1992). The fourth element requires that the misrepresentation involve a past or existing fact or, in the case of promissory fraud, that it involve a promise of future action with no present intent to perform. *Id.* at 423; *Oak Ridge Precision Indus., Inc. v. First Tenn. Bank Nat'l Ass'n*, 835 S.W.2d 25, 28 (Tenn. Ct. App. 1992). Persons asserting a negligent misrepresentation claim must establish:

> One, who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552(1) (1977); *Robinson v. Omer*, 952 S.W.2d 423, 427 (Tenn. 1997). At trial, HOA presented testimony of witnesses who all addressed being at the homeowners' meeting where Johnson represented to those gathered that he would correct the drainage problems within 30 days at his expense. The trial court thereafter determined that Johnson admitted to HOA members that there were drainage problems and declared that he would fix them. Based on the "testimony of numerous witnesses, and the photographs, and other information that has been presented as exhibits in this case," the court concluded that Johnson did not make the required repairs. After judging the credibility of the witnesses, the court properly concluded that Johnson did not intend to correct the issues as he represented he would do. In fact, Johnson testified that he never attempted to implement a new plan to deal with the drainage issue:

> Q:  *So let's understand here, Mr. Johnson, other than the original plan that Robert Campbell came up with for the development of Raleigh Court, there was no other plan to deal with the drainage problem?*
>
> A:  *No. You have to go by that master plan, the engineer's plan that the city – you got a stamp on this plan that they give you and that's the*

***plan you start with and the plan you end up with.***

(Emphasis added.). "It is well-settled that a trial court's assessment of witness credibility is entitled to great weight on appeal because the trial court saw and heard the witness testify." *C&W Asset Acquisition, LLC v. Oggs*, 30 S.W.3d 671, 676 (Tenn. Ct. App. 2007). "As we have further noted, the trier of fact is free to believe or disbelieve all or part or none of a witness's testimony even where the testimony is uncontradicted or is not directly impeached." *Id.* "We give great weight to a trial court's determination of credibility." *Id.*

Johnson however argues that "even if [he] did represent to some Raleigh Court homeowners that he would repair drainage problems, an overwhelming amount of evidence at trial pointed to the conclusion that he did make the necessary repairs prior to executing the quitclaim deed in favor of the association on January 11, 2008." To the contrary, the proof in the record reveals that Johnson threw some dirt and gravel under some decks and installed some yard drains, but the company did not do anything between the units where the real issues were located. The court considered the conflicting testimony on the issue of the alleged repairs and chose to believe the witnesses supporting the position of HOA. Nothing cited by Johnson is sufficient to set aside the trial court's findings. The trial court's decision must be affirmed.

Another contention asserted by Johnson is that since the city released the performance bond, the city placed its stamp of approval on the project and therefore Johnson cannot be found liable to HOA for damages. The proof at trial however does not support Johnson's contention that the release of the performance bond meant that all drainage issues were resolved at Raleigh Court. In pertinent part, the release specifically addressed the following:

> required site grading, construction of retention basins per approved plans, erosion and sediment control from the site during construction, the development certification (including as-built plans), "Covenants for Permanent Maintenance of Stormwater Facilities" referenced on the final plat and stabilization of disturbed areas after construction.

The release, therefore, concerns whether certain infrastructure criteria have been met. Mr. Williams specifically addressed this issue:

> Q:     What does that bond go to secure?
>
> A:     It typically goes to secure infrastructure and some of the, I guess, information and other things that are related to the infrastructure.

Q:     When you say infrastructure, can you tell me exactly what you mean by that?

A:     Typically we're speaking of the overall grading of the site, the pipes, the roadways, the detention ponds or retention ponds, things of that nature.

Thus, the release relates to certain minimum requirements demanded by the city and does not address particular problems that may arise unique to a particular piece of property that is being developed. Accordingly, while Johnson may have installed the appropriate pipes and built certain ponds as required by the city, the release did not signify the city's approval of the drainage conditions at Raleigh Court. Indeed, Johnson testified to the fact that the city will not even give advice on how to address a problem, much less stamp its approval on any plan:

Q:     Did the city ever give you a specific plan for addressing drainage problems?

A:     The city don't do that. The engineers give you that. You follow the plan that was originally set forth in the project. They give you a – you got to have a plan approved by the city, then the engineers lay all this stuff out for you.

Present in the record is an e-mail to Mr. Williams from Mr. Tokay, a former city employee in the Water Quality division, dated July 10, 2007, acknowledging the city's awareness of the drainage problem at Raleigh Court:

Donald Kitts called . . . today and wanted to know what the City can do to eliminate the ponding in the rear yards in Raleigh Court. I told him the bonds have not been released yet and the drainage is an issue to be resolved.

***The S/D has been buil[t] in compliance with approved plans, but rear yards never did drain well. Doy[le] Johnson has installed some additional yard drains. A junction box was an easy tie in point for the yard drains. The yard drain has helped in the immediate area around the inlets. In those areas where drainage remains a concern there is not a convenient drainage system to carry the collected water away. . . .***

(Emphasis added.). This e-mail confirms the city's recognition that despite the system's compliance with city-approved plans, drainage problems remained. Additionally, a note

from Mr. Tokay of record further reveals the city's observations of the problems at Raleigh Court and that Johnson had been advised of the situation:

Raleigh Court – Service request review – 8-16-2006

Mrs. Davis of 724 Graham Way requested I review a drainage/mosquito issue behind her condo.

***The area behind most of the units do[es] not have sufficient fall to convey stormwater to the junction box/yard drain. Ponding was evident in this area a few days after the last rain. Grass is having a difficult time growing due to the prolonged standing water.*** Most of the catch basins and junction boxes have standing water that pose a potential mosquito habitat. A new opening has appeared in the sinkhole/retention pond that poses a potential hazard. The rear walls of a few condos show the first signs of failure that may be of a building department concern.

* * *

Councilman Bob Becker had gotten a call regarding ponding from a property owner in Raleigh Court and wanted to know if inspections were aware of the situation. ***I told Councilm[a]n Becker we had reviewed the site and Todd Hu[n]ley (partner with Doyle Johnson) had been made aware of the new thr[e]at in the sinkhole and that ponding was an issue.***

(Emphasis added.). Clearly, the release of the performance bond did not establish that all drainage issues were resolved at Raleigh Court.

Johnson additionally asserts that the trial court erred in holding the company liable after the project had been accepted by HOA prior to the performance bond being released. Johnson argues that because a former president of HOA indicated he was satisfied with the drainage at Raleigh Court, then the entire development is precluded from asserting a claim.

The scope and extent of an agent's authority are questions of fact that must be determined from all of the facts and circumstances of the particular case. *Southland Express, Inc. v. Scrap Metal Buyers of Tampa, Inc.*, 895 S.W.2d 335, 340 (Tenn. Ct. App.1994). The burden of proving that an agency relationship exists rests on the party asserting it. *Sloan v. Hall*, 673 S.W.2d 548, 551 (Tenn. Ct. App.1984). The bylaws of HOA of record provide, in pertinent part, as follows:

-19-

a. <u>President</u>. The President shall be the chief executive officer of the Association and he shall have and be vested with all powers and authority as are lawfully and customarily incident to the office and those designated by the Board. The President shall preside at all meetings of the Association and the Board. The President along with countersignature of the Secretary shall sign all leases, mortgage deeds and other written instrument (except the signature of the Secretary will not be required on checks and other drafts of funds of the Association) issued in the name of the Association from time to time.

We find that the bylaws therefore do not confer upon the HOA president the authority to sign documents without the countersignature of the secretary. Accordingly, the action by the former president did not waive the rights of HOA to pursue this claim against Johnson.

Lastly, Johnson argues that the trial court erred in assessing damages against the construction company because Mr. Berry, the man HOA hired to correct the drainage problem, was not licensed and did not follow city ordinances.

The only proof regarding this issue was Mr. Berry's trial testimony that upon his inquiry to the city, he was told he did not need a permit to do the work. Johnson had ample opportunity to explore this line of inquiry with the city officials and failed to do so. Furthermore, we agree with the position of HOA that Johnson is trying to create a private right of action pursuant to a city ordinance in an attempt to create an affirmative defense. The record before this court does not contain any materials to support the contentions of Johnson. "Determining whether a statute creates a private right of action is a matter of statutory construction." *Brown v. Tennessee Title Loans, Inc.*, 328 S.W.3d 850, 855 (Tenn. 2010). Under the facts of this case, we must determine the city's intent "without limiting or expanding" the ordinance's coverage beyond what the city intended. *Id.* In our view, the power to enforce the ordinance belongs solely to the city. The trial court's award of damages was correct in light of the proof presented at trial. The testimony of HOA's expert witness established that the prior drainage system did not function correctly. Johnson did not repair it, so HOA had no choice but to protect its common elements. As the court found, since Mr. Berry installed his system, there have been no drainage problems at Raleigh Court. The only reliable evidence before the court as to cost of repairing the drainage problem was that proof provided by Mr. Berry. Accordingly, the court was justified in awarding the requested amount.

## V. CONCLUSION

The decision of the trial court is affirmed in its entirety and the case is remanded for

further proceedings.  The cost of the appeal is assessed to E. Doyle Johnson Construction Company.

_____
JOHN W. McCLARTY, JUDGE