# IN THE COURT OF APPEALS OF TENNESSEE
# AT KNOXVILLE
July 9, 2014 Session

## CENTIMARK CORPORATION v. MASZERA COMPANY, LLC.

### Appeal from the Chancery Court for Knox County
No. 182016-2     Daryl R. Fansler, Chancellor

---

### No. E2013-02689-COA-R3-CV-FILED-NOVEMBER 18, 2014

---

This suit arises as a result of a contract to install a roof on a commercial building. The building's owner argued that the roof has leaked since its installation and that the roofer would not or could not satisfactorily repair it. The roofer asserted that the roof had experienced some leaks but that all had been repaired. The roofer alleged that it had performed according to the contract and sued for total payment. The owner of the building alleged, inter alia, that the roofer breached the contract by failing to provide adequate materials and proper workmanship and filed a counter-complaint. The trial court issued its ruling in favor of the building owner on the counter-complaint and awarded $220,374.96 in damages. The court dismissed the roofer's suit. The court also dismissed the building owner's other claims against the roofer for deceptive business practices and for filing an improper lien. Both sides appeal. We affirm.

### Tenn. R. App. P. Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and W. NEAL MCBRAYER, JJ., joined.

Kenneth S. Christiansen and James Myers Morton, Knoxville, Tennessee, for the appellant, Centimark Corporation.

Darren V. Berg and John Tyler Roper, Knoxville, Tennessee, for the appellee, Maszera Company, LLC.

## OPINION

## I. BACKGROUND

The plaintiff, Centimark Corporation ("Centimark") is a Pennsylvania corporation with principal offices located in Cannonsburg, Pennsylvania. It is engaged in the business of supplying roofing systems and components for commercial construction projects. The defendant, the Maszera Company, LLC ("Maszera") is a Tennessee limited liability company with offices in Toms River, New Jersey. Maszera is the owner of the property at issue in this case, Chapman Commons, located at 4512 Chapman Highway in Knoxville, Tennessee.

In late April 2011, Knoxville and surrounding areas experienced a severe hailstorm. On April 27, 2011, Travis Ivey, the Knoxville area service director for Centimark, was contacted by Maszera and asked to assess the damage at Chapman Commons. As noted by the trial court, Ivey inspected the flat "rubber" roof and described it "as having crater size holes in the roof membrane" and "[i]n some instances, hail had gone completely through the metal decking beneath the membrane."

The parties stipulated to the existence of a contract "to remove the old roof and install a new 'forty-five mil TPO membrane over the existing decking structure'" at a cost of $209,530. The contract reflects a "15 year labor and material warranty" was to be issued and that "[a]ll Centimark Employees" were to be utilized. Removing the old roof involved taking it and the insulation board off down to the metal decking. The new roof was installed in June and July of 2011, over 38 working days, ending on August 1, 2011. The trial court noted, "[t]he particular membrane installed was manufactured by Versico. Centimark provides a fifteen year labor and material warranty on the roof. There is no manufacturer's warranty issued by Versico." After the installation of the new roof, Centimark performed a walkthrough with Charles Witt, Maszera's manager for the project, and a punch list was created, but Maszera asserts the roof has continued to leak since it was installed.

On January 12, 2012, Centimark brought this action because Maszera had only made partial payment and still owed $52,382.50. According to Centimark, it had properly performed under the parties' contract. Maszera answered the lawsuit denying liability and filing a counter-complaint asserting that Centimark breached its obligations under the contract by failing to provide adequate materials and proper workmanship. Maszera also sought treble damages and attorney's fees under the Tennessee Consumer Protection Act, Tennessee Code Annotated section 47-18-101, et. seq. ("TCPA").

## A. Testimony of Mike Hilton

Mike Hilton, Centimark's regional manager for Tennessee, Arkansas, and Mississippi, was the corporate representative at trial. He testified that Centimark does not use laborers who have not been through the company's training process and who are not experienced roofers. Hilton acknowledged that in the aftermath of the hailstorm, Centimark had acquired more business than normal, but claimed that despite the increase in work, Centimark never hired subcontractors or temporary workers. Hilton listed the following Centimark trained employees as the only laborers/workers who performed any work on the roof at issue: Tipton Amos (crew foreman); Brian Quakendal (crewman); Gary Parrish (field superintendent); David Bell (crewman); Shawn Fikes (crewman); Tony Byers (safety inspector); Dustin Abner (crewman); David Anderson (foreman); Drew Devins (service foreman); Ricky Evans (service foreman); Kenny Gibson (foreman); Danny Gibson (crewman); Robert Hartwell (crewman); Steven Humphreys (crewman); Mark Hunley (crewman); Ronnie Ivey (foreman); Paul Justice (service foreman); Patrick Klinger (crewman); Brian Messer (crewman); James Weaver (crewman); Benny Williams (crewman) and Wayne Duwhy (crewman). None of these individuals, however, testified at trial.

Hilton acknowledged that numerous leaks occurred after Centimark completed the installation of the roof. After rain events, representatives of Centimark would go to the roof and make repairs. Hilton admitted that from August 1, 2011, until the date this action was filed, either Maszera or Witt complained at least twenty separate times that the roof was leaking. Because of the numerous leaks, Maszera retained an independent roofing expert to investigate the cause of the problems. The expert's report ("the Weaver Report"), dated December 30, 2011, was forwarded by Maszera to Centimark. According to Hilton, Centimark thereafter responded to all of the concerns raised in it.

Hilton's activities on June 18, 2013, two days before the first day of trial, resulted immediately in a motion for sanctions from Maszera. The trial court heard argument on the motion the morning before trial commenced and found that Centimark had made no effort previously to inspect the roof and that "[t]here was a total lack of compliance with the Rules of Civil Procedure." The court excluded the use of any photographs taken by Hilton and precluded Centimark from offering "a last-minute explanation to exonerate itself. . . ."[1]

At trial, Hilton explained that he received from Mr. Christiansen, Centimark's attorney, an email Mr. Berg, Maszera's counsel, had forwarded to Mr. Morton, Centimark's other attorney. The email noted the substantial leaks at Chapman Commons with attached photographs. Hilton admitted the original email was sent by Maszera's counsel to Mr.

---

[1]Quotations from memorandum opinion; no order was filed regarding motion.

Morton and not to either Mr. Christiansen or himself; he further noted that the email did not state that Mr. Berg was on the roof of Chapman Commons. He claimed, however, that upon reading the email, he believed he "suddenly had permission to go by and inspect the property at . . . Chapman Commons":

Q: Which portion of that email gave you permission to go inspect the property that you're relying on – which portion?

A: The part, "So you may come by and inspect if you want, as I should be here all day," is the part that I read and stood out to me.

Q: Sent from me, the attorney, at my office, to these lawyers at their office, and you took that to mean that you could go get on the roof of my client's building without permission?

A: That's how I interpreted it, yes, sir.

Hilton admitted that he went to Chapman Commons in a truck with a ladder and that he climbed on the roof. He acknowledged that once he got on the roof, Maszera's counsel was not there:

Q: Then why did you stay up on the roof?

A: I need you to understand that I didn't think I was doing anything out of context or illegal, or anything that was not allowed.

Q: The email that you just read you said created an invitation for you to go out there because it said, "I'm here." When you got there and I wasn't there, why did you think you had permission to climb on my client's roof, conduct an investigation, and obtain evidence? Did Mr. Maszera give you permission, sir?

A: "So you may come by and inspect if you want, as I should be here all day," is really the words that stood out to me. And I hadn't been on this roof in months, and –

Q: You just thought in the middle of a case that was going to trial the next day, or two days, that you could go out there, without talking to me, without getting permission from Mr. Maszera, without getting permission from the general contractor, Mr. Witt, and you could just climb on the roof and do your

own investigation; is that what you're telling this court?

A:  That's exactly what I'm telling you.  I have never been in a court case.  I've never given a deposition in my life.  I have never been on trial, and I have never given testimony in all the years I've been with Centimark. . . .

* * *

Q:  You didn't really think I was at Chapman Commons, did you, sir?

A:  I didn't know who was at Chapman Commons.

Q:  Did you ask either of your lawyers if it was okay for you to go conduct your own investigation of the roof before you went to do it?

A:  Never asked anybody anything.

Hilton acknowledged attending depositions and hearing the court instruct his lawyers two days prior that Centimark had failed to obtain evidence.  He admitted taking numerous photographs while on the roof and performing an investigation with Zachary Perry, a Centimark tech representative he brought along with him.  Hilton however denied that he vandalized the property by pulling the flashing apart while on  the roof.  His testimony continued as follows:

Q:  Before the judge ruled this morning with regard to excluding your proposed testimony as to what the cause of the leaks were, you were prepared to come up with a third party who is responsible for the leaks; isn't that correct?

A:  I wasn't coming up with a third party, period.

Q:  Were you not prepared to come into Court today and testify that the cause of the leaks was somebody else other than Centimark?

A:  What I was prepared to come in and say was that when we left the project, the EIFS work was incomplete and wrapped with yellow board.  And when I inspected it that day, or got up on the roof, the yellow board had since been wrapped with EIFS, which is the external insulated finish system.

Q:  Are you aware that your counsel told me it was the stucco guy's fault

-5-

yesterday? Are you aware of that? Did he get that from you?

A: He would have got that from the email that I sent to Mr. Christiansen.

Q: Okay. So you were prepared to come and blame it on the stucco guy?

A: I was prepared to come in and say the reason the roof was leaking is because of the stucco work that was performed.

No evidence was ever presented by Centimark witnesses regarding personal knowledge of third party trades being present on the roof. Hilton observed that he had been on the roof a total of four or five times but was not on it once during the entire period of the work by Centimark. He also acknowledged that he did not actually know whether any member of the crew was smoking during the project period, explaining that he assumed they did not smoke based on the company's "zero tolerance no-smoking" policy. Hilton admitted that Witt was in a better position to "view the performance of [Centimark's] laborers" on the project because Witt was present on the roof during the project while Hilton was not.

Hilton admitted that Centimark did not obtain the required permits prior to beginning work on the project.[2] He also acknowledged that Centimark did not file a Notice of Completion with Knox County and did not request a final inspection to be performed by the City of Knoxville.[3] Hilton acknowledged that the contract did not require final payment until ten days after completion of the project.[4]

Counsel for Centimark claimed Maszera's counsel had "opened the door" to allow questioning of what Hilton recently observed on the roof:

MR. MORTON: He talked about other contractors, and I'm entitled to ask him to this day what's making the roof leak. I think he's opened the door, if

---

[2]The permits were obtained by Witt's company, TCS of Tennessee, Inc.

[3]Upon request by Witt as the general contractor for a final inspection, the Building Inspection Department of the City of Knoxville failed Centimark's roof on June 17, 2013. Hilton noted that in the notice, the inspector wrote "Roof leaking, drains not working properly, report by Roof Design Works dated 12/30/11, SAS roof was not properly installed."

[4]Witt later testified that he told Centimark the job was not complete based on the continuing leaks and, in his view, Centimark had not completed its performance from the day it left the job site through the day of trial.

the Court please.

MR. BERG: You Honor, I only did it for the motion for sanctions, which we agreed to take up in the proof in this case. It only went to my motion for sanctions, all the stuff he did on the roof. Leaking to this day is part of our counter-claim against [Centimark]. I didn't open the door. With respect to his opinion as to the stucco man, that was to show the reason he trespassed onto that roof was to fraudulently manufacture evidence to defeat a valid counter-claim by blaming a third party the day before trial. I have not opened any door. That was submitted solely for that motion for sanctions.

MR. MORTON: If he uses the word fraud, we're entitled to fight that. That's a big word.

MR. BERG: Mr. Witt is about to come in here and tell this Court that the only person that was on that roof the last time [Mr. Witt] was up there until yesterday was [Hilton and Perry]. He's going to tell this Court that the flashing was removed, and that was the ability for them to blame the stucco guy. That's to defeat a valid claim, and that is fraud.

THE COURT: I'm not going to let you go into that, Mr. Morton. I explained this morning [in chambers] why I was not going to.

MR. MORTON: Yes, sir.

B. Testimony of Charles Witt

Witt testified that he was the project manager and general contractor in charge of repair of the roof at Chapman Commons "from start to finish." He related that he had been a general contractor for 36 years in the area of commercial construction and had been in charge of commercial roofing projects on "well over a hundred" previous occasions. He noted that his general contractor's license from the Tennessee Board of Licensing Contractors permitted him to perform commercial construction projects.

Witt recalled that two days before trial, he found Hilton taking photographs in one of the spaces at Chapman Commons. He later discovered Hilton had been on the roof after talking to the building superintendent who "had noticed a truck out back with a ladder up on the building, and . . . actually saw . . . two people coming off the roof." According to Witt, he did not give Hilton permission to be on the premises or take photographs, and did not take Hilton around the shopping center to show him the locations where the roof was leaking.

Witt testified that after Centimark's personnel left, he climbed onto the roof to inspect it. Prior to that occasion, he had last been on the roof some two months prior. To his knowledge, no one else had been given permission to be on the roof during the interim period. On that day, the roof was leaking in five separate units of Chapman Commons. He explained, however, that the roof was actually leaking in twelve different locations. Describing his inspection, Witt proclaimed that "there were several places where the coping had been pulled loose on top of the roof." He opined that this loose coping was what Hilton had intended to claim was the cause of the leaks. According to Witt, the loose coping was not the result of storm damage and had been intentionally pulled loose. With regard to the purported attempt to blame the stucco contractor for the leaks, Witt related that there were "termination flashings between the stucco and the TMO membrane that had been pulled loose as well." He explained that evidence of intentional damage to the roof existed in "probably about half a dozen" other places.

Witt recalled that because of the hailstorm, a great number of commercial roofing projects were occurring "all over town" during the summer of 2011. He explained: "everybody at the time was trying to lock down all the jobs they could. I mean, it was like the lottery, and everybody was grabbing for everything they could to get them under contract. So there was roofing companies and personnel literally from all over the country in here." He observed the result was that unqualified laborers were working roofing projects based on a lack of qualified personnel.

According to Witt, on most days Centimark "would have eight or nine roofers up there." He opined it was substandard performance to have nine inexperienced crewmen to be overseen by a single experienced roofer. He recalled a conversation he had with Centimark's foreman who said "himself and one other [Centimark] guy were the only people that had been on a roof before." Witt remarked this statement was consistent with his personal observations and conclusions: "[T]hey didn't know what they were doing." During the leak repair work, Witt once asked a Centimark employee why the roof was continuing to leak and why so many problems were occurring. According to Witt, the employee responded that, "[t]his crew was unqualified to do a job of this size."

Witt recalled numerous things he observed that were improper: "[W]e had issues about them smoking on the roof, which in the industry, due to the – you know, the damage that can [occur] with cigarette burn marks on the roof, that should never occur." He stated he personally asked the only Centimark foreman he ever saw on the project, Amos, to make the workers quit smoking on the roof. Additionally, Witt personally observed the Centimark crew do the following:

I guess one of the biggest things is as they were tearing the roof off, they were

continually . . . they put the [new] roof down and then they were walking back across the [new] roof tearing the rest of the roof off. And I asked [them] several times about putting some protective barrier down on the roof because, obviously, they're dragging screws and insulation board and what have you. All their debris came back across the brand new roof they had just put on.

Witt continued:

[T]hroughout the entire course of the roof, they were continually walking across the new roof they had put down with the debris torn off in another section. So you're continually dragging insulation and screws and fasteners, people walking across it. There's nails laying on the roof, people step on them.

Witt further related that all sorts of debris was left on the insulation board (i.e., screws, fasteners, etc.) that ended up covered underneath the membrane. Such items were "going to cause a leak at some point" if they have not already. He opined that this conduct in performing the contract amounted to a breach of the standard of care and constituted substandard performance.

Witt explained that the roof's insulation board is attached with, among other things, metal fasteners. He complained that Centimark's employees did not properly screw the fasteners down far enough. As a result, the heads were sticking up and were penetrating the membrane put down on top of them. Witt explained that over time, this improper installation of fasteners caused leaking to occur. Additionally, Witt testified that the underlying metal decking on the roof was rusted in numerous locations and those sections should have been removed before Centimark installed the new roof. He noted that the decking was so rusted in some places that the rust could be seen from underneath. He recalled that he was in a "constant battle" with Centimark about whether they needed to replace the rusted decking and declared the roof was put down over the rusted sections despite his objections as the overall project manager and general contractor.

Witt, who was on site "every day," testified that the roof had never stopped leaking. Witt claimed "it's not a good quality job." He noted that no one other than Centimark and its employees had attempted to do any repair work or patch work to the roof. Witt observed that he had "never been involved in a job . . . in [his] career" with as many problems and that "the only people involved in the roof" were with Centimark. Witt testified that no other trade

was responsible for the problems with the roof.[5]

Due to the hailstorm, the portion of the roof over the former Food City space at Chapman Commons "had significant damage to it as well." Maszera, however, contracted with someone else for that roof and it was replaced earlier in 2013. Witt noted that since completion of that roof job, not even one leak had been experienced. According to Witt, the only difference between the two replacement jobs was one was performed by Centimark and the other by someone else. Interestingly, the Centimark project was smaller, covering roughly 33,400 square feet compared to 48,500 square feet on the other job.

In Witt's view, Centimark never completed its performance because the roof never stopped leaking. He opined that it was not proper for a roofer to walk off the job when the roof is still leaking and when the general contractor says the job is not complete. According to Witt, the roof needs to be completely removed and replaced to "reassure the owner that we will have no leaks going forward." He noted removal and replacement was the only way to ensure Maszera would obtain a roof with no leaks and a fifteen year warranty. He observed that even if it were possible to have someone else continue patchwork efforts, Maszera would not get a warranty, as other roofing subcontractors would not guarantee or warranty the work unless an entirely new roof was installed. Witt testified that he had prepared an offer to Maszera to "[t]ear the entire roof off and start all over again for $220,374.96. He observed that amount was "within eleven thousand dollars of what Centimark charged two years ago."

On June 3, 2013, Luis Rodriguez[6] also had provided Maszera an estimate to replace the roof. Rodriguez's estimate was $165,151.00. However, on June 11, 2013, shortly before trial, Centimark had moved the court to exclude the expert testimony of Witt, Rodriguez, and Skip Murray. Attached to the motion was Rodriguez's estimate. According to Centimark, it considered Rodriguez and his estimate to be synonymous. Maszera's counsel thereafter announced it would proceed without the testimony of Murray and Rodriguez. The trial court denied Centimark's motion as to Witt because Centimark had known of him and his likely testimony since June 2012. At trial, Centimark objected to Witt's estimate, contending it incorporated Rodriguez's estimate by reference and added $55,223.96 to it:

THE COURT: Mr. Morton, you're going to force me to do what I don't think you want me to do, go exactly through line by line in your motion in limine

---

[5]Centimark failed to call any witnesses to rebut Witt's testimony that no other trade was on the roof during the relevant period.

[6]Also spelled as "Lewis Rodriguez" or "Louis Rodriguous" at times in the record.

and see what you objected to as to this witness's testimony.

MR. MORTON: Your Honor, we're not complaining about Mr. Witt being here testifying. He's a fact witness. What the Court – what we are complaining about is Mr. Rodriguez. They are using Mr. Witt to get Mr. Rodriguez's estimate in. We're not complaining about Mr. Witt being here, Your Honor. I'll move on.

THE COURT: No, no, we're not going to move on. We're going to get this record abundantly clear so I don't have to go through this again, okay? Let me find your motion, all right?

* * *

THE COURT: I'm going to read the Plaintiff's Supplemental Motion in Limine filed June 17. "Comes Plaintiff, through counsel, and supplements the previously filed motion in limine to inform the Court that the Defendants are failing to provide full names and addresses to at least one of the three purported expert witnesses.

Additionally, Defendant has limited Plaintiff's time to depose three expert witnesses to four hours, despite Plaintiff's objections."

* * *

Now, I'm going to find the other pleading which was not attached to the motion in limine. We're going to see what it says. It is captioned, "Plaintiff's Motion in Limine." It says, "Comes Plaintiff, through counsel, and moves the Court in limine to preclude Defendant from having any of the three purported expert witnesses, Charles Witt, Luis Rodriguez, and Skip Murray, testify for Defendants at the trial of this cause on June 20, 2013.

As set forth more fully in Plaintiff's brief in support of this motion filed contemporaneously herewith, Defendant unseasonably supplemented interrogatory responses respecting expert testimony.

Within thirty-three days prior to trial, Defendant again supplemented his interrogatory responses by naming a new expert, Charlie Witt. The response failed to provide the required expert information.

-11-

Wherefore, Plaintiff moves this Court to preclude Charlie Witt, Luis Rodriguez and Skip Murray from testifying at the trial on June 20, 2013."

We also have here – what other one was I thinking about, the Motion for Continuance, Scheduling Conference and Entry of Scheduling Order in the initial pleading filed. And when we got interrogatory responses – I'm not sure I that I even have those – it showed that Mr. Witt had been disclosed early on in this case, that his address had been disclosed early on in this case. He was identified as an expert witness in this case, and there had been no attempt to depose him until the week before trial. And I will stand corrected if you can show me a transcript, Mr. Morton, if either of you stood up here and said you did that in this case.

MR. MORTON: No. No, sir; you're correct. You are exactly correct.

THE COURT: Should have been what you intended for him not to testify about damages.

MR. MORTON: I didn't know he was going to adopt what Mr. Rodriguez said.

THE COURT: You had four hours to depose him.

MR. BERG: He knew it.

MR. MORTON: He had to leave. I didn't get to it.

MR. BERG: Your Honor, how did [Mr. Morton] goes [sic] get the report? I provided it to him. He questioned [Mr. Witt] about it [at the deposition three days before trial].

MR. MORTON: Your Honor, you understand my point, right?

THE COURT: Yeah. You obviously aren't getting mine, because I'm going to sustain the –

MR. MORTON: I won't say another word about it, Your Honor.


Moving to the issue of the warranty for the roof, Witt explained that the Centimark warranty was "very unique" because Centimark issues its own warranty – unlike the warranty

Maszera received on the other roof replaced at Chapman Commons issued directly by the manufacturer. Witt opined the document Centimark sent Maszera purporting to be a warranty was not even close to being one.

In response to Centimark's counsel's question of how coping had been put on the roof if no other trade had been on the roof, Witt noted "[c]oping hasn't been put on the roof. . . . The coping has not been replaced yet." He explained that the coping in question had been put on the roof prior to the hailstorm. He testified that he knew Centimark did not put membrane under the coping because he watched Centimark's crew fail to do so.

Gary Lowe, a building inspector for the City of Knoxville, informed the court that he based his decision to fail the roof on the Weaver Report which said the roof was improperly installed.

## C. Testimony of Dmytro Maszera

Dmytro "Danny" Maszera testified that he is the owner of Chapman Commons through his company, Maszera. He related that during his original conversations with Eric Heath of Centimark, he was very concerned about obtaining a manufacturer's warranty. Mr. Maszera stated that he had been promised a manufacturer's warranty prior to the agreement being formed "by the salesman who sold me the job." According to Mr. Maszera, he had a follow-up conversation with Sherman Gaskins of Centimark where Gaskins, a vice president, informed him he would personally get Maszera a manufacturer's warranty. Mr. Maszera complained that Gaskins never provided him an actual manufacturer's warranty; rather, he gave him a letter from the manufacturer which was not a warranty. Mr. Maszera claimed that had he known he was only going to receive a private label warranty from Centimark and not have the added protection of a manufacturer's warranty, he would not have contracted with Centimark.

Mr. Maszera further testified that before entering into the agreement with Centimark, its representatives promised him that Centimark would only use their own employees who were all qualified roofers. He stated that if he had known Centimark would actually use a crew of laborers who had never been on a roof before, he would not have hired Centimark to do the work. He testified that he did not pay the remainder of the contract price because the roof leaked from the time Centimark tendered its performance until the day of trial and Witt told him Centimark had not completed its performance.

## D. Judgment of the Trial Court

On November 7, 2013, the trial court found in favor of Maszera on the counter-

complaint and awarded $220,374.96 in damages. The court dismissed Centimark's suit against Maszera; it likewise dismissed Maszera's other claims against Centimark for deceptive business practices and for filing an improper lien. The memorandum opinion reflects as follows:

> This case involves a contract to install a roof on [Maszera]'s building. [Centimark] alleged that it had provided, furnished, and supplied the labor and materials as required by the contract. It was further averred that [Maszera] had paid some but not all [Centimark] was due. [Centimark] asserted that $52,383 remained owing, and that it was entitled to a lien pursuant to Tenn. Code Ann. § 66-11-101 et seq.
>
> [Maszera] answered asserting several defenses including the allegation that [Centimark] breached the contract by failing to provide adequate materials and proper workmanship to finish the work "in a manner consistent with the agreement." Further, [Maszera] asserted a counterclaim alleging that [Centimark] had breached the contract and had engaged in deceptive business practices when it represented it could perform the work. Further, [Maszera] says [Centimark] failed to complete the work and wrongfully asserted the lien.
>
> . . . On October 27, 2012, counsel for the parties moved to continue the trial to June 20, 2013, to allow them to continue to engage in discovery. The motion was granted and the case was reset to June 20, 2013.
>
> On June 10, 2013, [Centimark] again moved for a continuance complaining that [Maszera] had submitted discovery on May 13, 2013, and it did not have adequate time to respond. Further, [Centimark] said [Maszera], for the first time, disclosed two potential expert witnesses on May 13. Additionally, [Centimark] complained that [Maszera] had yet to respond to [Centimark]'s second set of interrogatories and request for production of documents. [Centimark] also filed a Motion in Limine seeking to preclude [Maszera] from offering the testimony of Charles Witt, Lewis Rodriguez, and Skip Murray.
>
> [Centimark]'s motions were heard on June 18, 2013. [Maszera] opposed the motions arguing that the roof on its building had leaked from the inception of [Centimark]'s work and that [Centimark] would not or could not satisfactorily repair it. [Maszera] argued that a new roof would have to be installed and it wanted the case tried.
>
> [Centimark] argued that the roof had experienced some leaks but represented

-14-

that all had been repaired. [Centimark] further argued that it had monitored the roof during numerous rain events and was satisfied that the roof did not leak. [Centimark]'s counsel stated they were ready for trial but for the "surprise" trial experts.

In response, [Maszera]'s counsel announced they would proceed without the testimony of Murray and Rodriguez but correctly pointed out that [Centimark] had known about Charles Witt and the likely substance of his testimony since at least June 2012. Therefore, the Court denied the Motion for Continuance and the Motion to Exclude Witt's Testimony. The case remained set for trial on June 20, 2013.

At or near the same time [Centimark]'s motion was being argued on June 18, Mr. Witt was at the shopping center documenting significant ongoing leaks in the roof. That afternoon, Mr. Berg, [Maszera]'s counsel, e-mailed pictures taken by Witt and disclosed to [Centimark]'s counsel, Mr. Morton, that there would be others coming. . . .

Mr. Morton shared the e-mail with Mike Hilton, [Centimark]'s chief witness, who had been heavily involved in the case from the outset. Mr. Hilton, without seeking permission or arranging for defense counsel to be present, and without telling his own lawyer, proceeded to the shopping center and inspected the roof and interior spaces.

On June 19, [Maszera] filed a Motion for Sanctions asking that a default judgment be entered. Alternatively [Maszera] sought to exclude any photographs taken by Mr. Hilton and to preclude [Centimark] from offering for the first time a "brand-new theory" as to the cause of the leaking roof. It was further averred that Mr. Hilton and his coworker intentionally damaged certain parts of the roof on June 18, 2013, for the purpose of making it appear that they had an explanation for the leaks that were occurring in [Maszera]'s building.

The Court heard argument on the Motions for Sanctions on June 20 before the trial commenced. [Centimark] apparently had a year and a half to inspect the roof prior to this trial date but made no effort to do so. There was a total lack of compliance with the Rules of Civil Procedure. Therefore, the Court excluded any photographs taken by Mr. Hilton and precluded [Centimark] from offering a last-minute explanation to exonerate itself.

The Court reserved ruling on the Motion for Sanctions until proof could be taken. Defense counsel was instructed to segregate that proof from evidence regarding defenses or in support of the Counter-Complaint.

* * *

[Centimark] maintains that it repaired all leaks in the roof. Mr. Hilton says they made many repairs that were not caused by [Centimark] or its employees. Further, he says many of these repairs would not have been covered under the Centimark warranty had it been issued. [Centimark] acknowledged continuing complaints of leaks from [Maszera]. It cannot be disputed there were significant leaks as late a[s] June 18, 2013.

Mr. Hilton offered much testimony about how the job was conducted. However, he was not on the roof until after [Centimark] had completed insulation. Not one Centimark employee was called to testify even though Mr. Hilton testified that only three of the employees that worked on that job were no longer employed by Centimark. Additionally, Mr. Hilton testified that David Anderson, who had worked on the Maszera job, was at the time of trial a foreman on a job in Erwin, Tennessee. Paul Justice, at the time of trial, was the service foreman in Knoxville. While certainly some of the supervisory personnel were unavailable, there was no explanation as to why Mr. Anderson nor Mr. Justice were not called to rebut allegations by Mr. Witt.

[Centimark] admits that it bore responsibility for some of the problems and maintains those problems were properly repaired. [Centimark] has no explanation as to the cause of the additional and continuing leaks except for speculation on the part of Mr. Hilton who was not there during the installation of the roof.

Charles Witt testified that the job overall was of poor quality. He offered specific explanations for the leaks. Most, if not all of those explanations, were supported by his personal observation of [Centimark]'s employees and the methods of installation. [Maszera] even hired a roofing consultant to try to determine the cause and remedy of the ongoing problems.

[Centimark] was given ample opportunity to stop the leaks but failed to do so. In early 2012, [Centimark] made the decision to do no more repairs unless [Maszera] paid for those repairs. In fact, [Maszera] was billed several hundred dollars for those repairs occurring 2012.

-16-

[Centimark] has failed to correct the problem or to offer an identifiable solution. Unquestionably, the roof continues to leak and, for all purposes, has completely failed. Mr. Witt says the only solution is to replace the roof and as estimated, it will cost $220,374.96 to do so. Centimark's original contract was for $209,530. [Maszera] has paid $157,147.50, leaving a balance of $52,382.50 on the original Centimark contract.

[Maszera] has proved by a preponderance of the evidence that [Centimark] breached the contract by failing to install the roof in a workmanlike manner. [Maszera] claims it is entitled to either the original contract price or the replacement cost price. "If defects in workmanship are so substantial that the performance of the contract made by the Defendant is worthless, the contractor must pay the other party the cost of having the job redone." *Wilhite v. Brownsville Concrete Co.*, 798 S.W.2d 772 (Tenn. Ct. App. 1990) citing 22 Am. Jur.2d, *Damages* §68.

The Court is of the opinion this roof has failed its essential purpose. Leaks continue. [Centimark] will no longer stand behind its work. [Maszera]'s only recourse is to start over, particularly if [Maszera] is to obtain a valid warranty.

Defendant Maszera company has counter-claimed for the costs of replacement of the roof and for damages allegedly caused by "deceptive business practices." [Maszera] makes those allegations in paragraph 4 of its Counter-Complaint. In that paragraph, [Maszera] says that [Centimark] engaged in deceptive business practices when it represented it could perform the work. Further, it is alleged that it was a deceptive business [practice] to fail to complete the work as represented. The third so called deceptive business practice is alleged to have been the filing of a wrongful lien. Fourth, [Maszera] says it was deceptive for Centimark to bill for work and service calls that were part of the labor and materials warrantied.

Mr. Hilton testified that Centimark was the largest roofing contractor in the world. Undoubtedly, Centimark did represent that it could perform this particular job. Mr. Hilton also testified about several other large jobs that Centimark had done in this particular area. There is nothing false or deceptive about Centimark's representation that it could perform this job. The fact that on this occasion it did so in a negligent manner or failed to do so in a workmanlike manner does not prove the company was incapable of doing this particular job.

[Maszera] says that Centimark failed to complete the work as represented. There is no specific testimony about what Centimark represented that it would do but failed to do. There is no testimony that Centimark failed to install what they promised. The evidence is that i[t] simply failed to do so in a workmanlike manner.

At the time the lien was filed, there was ongoing controversy about the cause of the continuing leaks. Centimark was owed in excess of $50,000. The lien was recorded on November 2, 2011, well before the parties reached an impasse. The Court finds nothing unfair or deceptive about [Centimark] attempting to assert the lien in an effort to collect what it thought was a valid debt, particularly at the time the lien was filed.

Next, [Maszera] complains it was billed for repair work in 2012. The uncontroverted testimony is that even though Centimark billed for repairs, there has been no effort to collect and these were not part of this suit. Tenn. Code Ann. § 47-18-109 provides for a private right of action by any person who suffers from ascertainable loss of money or property as a result of the use or employment by another person of an unfair or deceptive act or practice as described in Tenn. Code Ann. § 47-18-104(b). [Maszera] did not cite that code section nor did it identify any of the fifty-one unfair or deceptive acts contained therein as being the basis for its claims. Nevertheless, it is clear from the testimony that [Maszera] has not paid those invoice repairs, nor did [Centimark] seek to collect those in this case. Therefore, the Court concludes that [Maszera] suffered no ascertainable loss as a result of that billing.

* * *

For the reasons stated herein, the Court finds that [Centimark] failed to install the roof in a workmanlike manner. The Court further finds that efforts to remedy the problem have failed and [Centimark] has abandoned the project, thus failing in its attempt to correct the defects or otherwise determine the cause and remedy for the ongoing leaks. The Court finds in favor of [Maszera] on its counter-claim and awards [Maszera] a judgment in the amount of $220,374.96 and dismisses the original Complaint and dissolves the mechanics and materialm[e]n's lien.

The Court finds in favor of [Centimark] in regards to Maszera's claims for deceptive practices. Further, the Court dismisses any additional claims set forth in the Counter-Complaint.

Counsel for [Maszera] is to prepare a judgment incorporating this Memorandum Opinion by reference as if set forth verbatim therein. . . .

Centimark filed a timely appeal of the trial court's award to Maszera of $220,374.96. Maszera likewise filed a ripe appeal of the dismissal of the TCPA claims.


## II. ISSUES

The issues raised on appeal by Centimark are restated as follows:

a. Did the trial court rule that comparative fault was an affirmative defense in contract actions.

b. Did the trial court improperly allow admission of evidence (an estimate of roof repairs) despite previously excluding the same evidence.

c. Did the trial court properly rule that there was no violation of the TCPA.

The issue[7] raised on cross-appeal by Maszera is as follows:

Whether the trial court erred in dismissing Maszera's claim of deceptive business practices by finding that Maszera had failed to prove a specific misrepresentation made by Centimark.


## III. STANDARD OF REVIEW

After a bench trial, we review a trial court's findings of fact de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). Because the trial court is in the best position to observe witnesses and evaluate their demeanor, we afford great deference to a trial court's credibility determinations. *Hughes v. Metro. Govt. of Nashville and Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). We review questions of law de novo with no presumption of correctness. *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006).

In order to prevail in a breach of contract case, a plaintiff must prove "the existence

---

[7]Maszera moved to withdraw a portion of its cross-appeal. That motion is hereby granted.

of a valid and enforceable contract, a deficiency in the performance amounting to a breach, and damages caused by the breach." *Federal Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011) (citing *ARC LifeMed, Inc. v. AMC-Tenn., Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)). In *Bowling v. Jones*, 300 S.W.3d 288 (Tenn. Ct. App. 2008), we observed as follows regarding implied duties encompassed in construction contracts:

> Once a builder undertakes a construction contract, the common law imposes upon him or her a duty to perform the work in a workmanlike manner, and there is an implied agreement that the building or work performed will be sufficient for the particular purpose desired or to accomplish a certain result. Thus, failure to perform a building contract in a workmanlike manner constitutes a breach of contract.

*Id.*, at 291(quoting 13 Am. Jur. 2d *Building and Construction Contracts* § 10 (2000)). As noted in the *Federal Ins. Co.* opinion:

> Other authorities recognize this implied duty as not only applicable to construction contracts, but to all service contracts. *See* 17A Am. Jur. 2d *Contracts* § 612 (2011) ("[T]here is implied in every contract for work or services a duty to perform skillfully, carefully, diligently, and in a workmanlike manner."); 23 Samuel Williston, Williston on Contracts § 63.25 (4th ed. 2011) ("Accompanying every contract is a common-law duty to perform with care, skill, reasonable expediency . . . the thing agreed to be done . . . . whether a contract for services is breached depends upon whether the service provider exercises or fails to exercise that degree of skill and knowledge normally possessed by those members of the trade. . . .").

*Id.*, 354 S.W.3d at 291-292. "A breach is 'material' if a party fails to perform a substantial part of the contract or one or more of its essential terms or conditions, the breach substantially defeats the contract's purpose, or the breach is such that upon a reasonable interpretation of the contract, the parties considered the breach as vital to the existence of the contract." 23 Williston on Contracts § 63.3 (4th ed. 2011).

## IV. DISCUSSION

### A.

In its answer to Maszera's counter-complaint asserting breach of contract, Centimark denied that the roof was leaking and never amended that pleading. At the March 27, 2013

deposition of Gaskins, he related that Centimark had no proof that any other party was responsible for the leaks. Discovery responses from Centimark indicated it would not be calling any expert witnesses at trial. At the June 18, 2013 hearing[8] on Centimark's motion for continuance and motion in limine, counsel for Centimark informed the trial court the company's position at trial would be that the roof was no longer leaking.

Based upon Hilton's actions in climbing on Maszera's roof two days before trial, Maszera's counsel filed a motion in limine and for sanctions. In the motion, counsel argued that any evidence obtained by Centimark's employees from the visit to the roof should be excluded as well as any allegation that a third party was responsible for the leaks for the following reasons: (1) Centimark had failed to amend its answer wherein it denied that the roof leaked; (2) it had failed to disclose any experts who would testify as to such causation; (3) it had failed to supplement the testimony of Gaskins that Centimark had no knowledge of the fault of any other party; and (4) it had illegally obtained the evidence. The trial court excluded the evidence, noting that Centimark's actions were, at the very least, "trial by ambush." A portion of later trial transcript reflects the position of the trial court:

> THE COURT: And you haven't even plead it. How are you supposed to offer testimony on something that isn't even plead, Mr. Morton?
>
> MR. MORTON: We plead that we're not responsible for the leak, Your Honor. And the leak is not coming from the roof. It's coming from – what's it called – stucco that was put up adjacent to it. It's where the stucco was put in by this other sub. I'd love to third party in another party, but it's too late. We're at trial.
>
> THE COURT: I'm not talking about third party, Mr. Morton. I want to know why you think some party to a lawsuit should be able to come up with a whole new theory and defense to a counter-complaint the day before the trial and step up here and put on your evidence is what I want to know?
>
> MR. MORTON: If the Court allows it, we're not putting on a new theory. We're saying we're not responsible for this water leak. When we were –
>
> THE COURT: Where have you said anywhere in your discovery that it's somebody else, that it's something other than a roof leak?
>
> MR. MORTON: We've not ever –

---

[8]There is no transcript or statement of evidence or proceedings concerning this hearing in the record.

THE COURT: You all were down here just the other day moaning – moaning and gnashing at teeth about trial by ambush. Now, what in the world would you call this but trial by ambush?

MR. MORTON: I didn't anticipate that this evidence would ever even exist.

THE COURT: Well, somebody could have anticipated it, Mr. Morton, if they'd done discovery, it they had, in response to a lawsuit filed against them, said, "Can I come and look at it and see if I can help you figure out what's causing your leak because I don't think it's my job that did it."

MR. MORTON: We're prepared to proceed without that evidence.

THE COURT: Well, you won't get that evidence in, Mr. Morton, I'll just tell you. You won't get it in.

MR. MORTON: Okay.

THE COURT: You know, we went down there the other day and everybody wanting to try this case, wanting to try this case, wanting to try this case, and it's not going to come in at the eleventh hour like this. It's just not going to happen.

Centimark now argues that the trial court applied tort law to this contract case, contending that the reason the court would not allow it to blame a third party at trial was because Centimark did not allege the comparative fault of a third party as an affirmative defense in its answer to Maszera's counterclaim. Clearly, the trial court excluded the evidence because it found the evidence was obtained in disregard for the Rules of Civil Procedure and that to allow its use on the eve of trial would have amounted to "trial by ambush." The admissibility of evidence is within the sound discretion of the trial court. *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992). Trial courts are accorded a wide degree of latitude in their determination of whether to admit or exclude evidence, even if such evidence would be relevant. *Id.* We can only overturn the trial court's decision to exclude the evidence if the trial court applied an incorrect legal standard or reached an illogical or unreasonable decision that causes an injustice to Centimark. *See Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). As our the Supreme Court noted in *Eldridge*,

Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to [the] propriety of the decision

made." . . . The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.

*Id.*, at 85. Here, the record is devoid of evidence suggesting that the trial court abused its discretion.

Significant to Centimark's appeal of the trial court's evidentiary rulings is the fact that it failed to file a transcript or a statement of the evidence or proceedings prepared in accordance with Tennessee Rule of Appellate Procedure 24(c) of the hearing on the pretrial motions which occurred in chambers. Rule 24 of the Tennessee Rules of Appellate Procedure provides, in pertinent part:

> (b) **Transcript of Stenographic or Other Substantially Verbatim Recording of Evidence or Proceedings**. If a stenographic report or other contemporaneously recorded, substantially verbatim recital of the evidence or proceedings is available, the appellant shall have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal. Unless the entire transcript is to be included, the appellant shall, within 15 days after filing the notice of appeal, file with the clerk of the trial court and serve on the appellee a description of the parts of the transcript the appellant intends to include in the record, accompanied by a short and plain declaration of the issues the appellant intends to present on appeal. . . . The transcript, certified by the appellant, appellant's counsel, or the reporter as an accurate account of the proceedings, shall be filed with the clerk of the trial court within 60 days after filing the notice of appeal.

> (c) **Statement of the Evidence When No Report, Recital, or Transcript Is Available.** If no stenographic report, substantially verbatim recital or transcript of the evidence or proceedings is available, the appellant shall prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement should convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal. The statement, certified by the appellant or the appellant's counsel as an accurate account of the proceedings, shall be filed with the clerk of the trial court within 60 days after filing the notice of appeal.

As noted in *Ragland v. Oakland Deposit Bank*, No. W2011-2303-COA-R3-CV, 2012 WL 2849518 (Tenn. Ct. App. July 12, 2012),

"The absence of either a transcript or a statement of the evidence significantly ties the hands of the appellate court." "The duty to see to it that the record on appeal contains a fair, accurate, and complete account of what transpired with respect to the issues being raised on appeal falls squarely on the shoulders of the parties themselves, not the courts." Generally, the failure to file an adequate appellate record will be attributed to the appellant, who bears the responsibility to prepare a record that is adequate for a meaningful appellate review. Without an appellate record containing the facts, this court cannot perform a de novo review or determine the preponderance of the evidence. Therefore, in such cases, we generally assume that the record, had it been preserved, would have contained sufficient evidence to support the trial court's factual findings.

Id., at *5 (citations omitted). We assume the record of that hearing, had it been preserved, would have supported the trial court's findings and conclusion to exclude the evidence and to preclude Centimark from blaming third parties. *See Reinhardt v. Neal*, 241 S.W.3d 472, 477 (Tenn. Ct. App. 2007).

The Rules of Civil Procedure imposed a duty on Centimark to supplement its discovery responses regarding the identity and fault of alleged third parties. *See* Tenn. R. Civ. P. 26.05(2). Centimark's failure to supplement such responses precluded it from using "as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed." Tenn. R. Civ. P. 37.03(1). Centimark failed to conduct discovery in accordance with the Rules of Civil Procedure, and it failed to determine whether or not the roof was still leaking because it never sought to inspect it during the seventeen months the case was pending. Even if the excluded proof had been admitted, Centimark still failed to put forth any witnesses or evidence that another trade was on the roof from the date its performance was commenced until the date of trial. *See* Tenn. R. Evid. 602; *Amanns v. Grissom*, 333 S.W.3d 90, 102 (Tenn. Ct. App. 2010).

## B.

Centimark argues that "[t]he trial court allowed admission of evidence (an estimate of roof repairs) despite the court previously excluding the same evidence." The trial court granted Centimark's motion in limine to exclude Rodriguez as a testifying expert witness at trial. It did not, however, specifically exclude the estimate Rodriguez prepared, Witt's offer

to Maszera, or Witt's testimony of the amount he estimated to fix the roof.[9]

Even if the trial court impliedly excluded the Rodriguez estimate, Witt could still rely on it in compiling his offer, as a contractor like Witt routinely relies on the estimates and bids of subcontractors in determining the total estimate for a particular job. "An expert opinion based on inadmissible evidence is permitted if the facts or data on which the opinion are based are trustworthy and 'of a type reasonably relied upon by experts' in the field" in forming opinions or inferences upon the subject. *Holder v. Westgate Resorts, Ltd.*, 356 S.W.3d 373, 379 (Tenn. 2011) (quoting Tenn. R. Evid. 703). *See State v. Lewis*, 235 S.W.3d 136, 151 (Tenn. 2007) (permitting an expert to testify to an opinion based on inadmissible hearsay evidence). Accordingly, Witt was permitted under the evidentiary rules to rely on the Rodriguez estimate in calculating his expert opinion regarding his offer to replace the roof. The trial court's action in allowing Witt's estimate that incorporated Rodriguez' estimate was not an abuse of discretion. The probative value outweighed any prejudicial effect. Tenn. R. Evid. 703.[10]

Furthermore, as we noted previously, "[a]bsent an essential part of the record, this court must presume that the trial court's determination is correct." *State v. Boling*, 840 S.W.2d 944, 951 (Tenn. Crim. App. 1992). Centimark failed to include in the record a transcript or statement of the evidence or proceedings of the hearing on the motion where these issues were raised. We must assume the trial court's determination regarding this evidence was correct. Tenn. R. App. P. 24(b); *Boling*, 840 S.W.2d at 951.

## C.

"The purpose of assessing damages in a breach of contract suit is to place the plaintiff, as nearly as possible, in the same position he would have had if the contract had been performed." *Wilhite v. Brownsville Concrete Co.*, 798 S.W.2d 772, 775 (Tenn. Ct. App. 1990). A trial court's determination regarding the proper amount of damages is a question of fact. *GSB Contractors, Inc. v. Hess*, 179 S.W.3d 535, 541 (Tenn. Ct. App. 2005) (citing *Beaty v. McGraw*, 15 S.W.3d 819, 827 (Tenn. Ct. App. 1998)).

For breach of a construction contract actions, courts typically apply either the cost of

---

[9]There is no transcript or statement of evidence or proceedings concerning this hearing in the record.

[10]"Rule 703 does not permit a testifying expert to act as the 'mouthpiece' of a non-testifying expert by simply parroting the non-testifying expert's opinion. . . . The opinion to which an expert testifies must be his own." *Holder*, 356 S.W.3d at 380-81 (citations omitted).

repair or diminution in value methods as the proper measure of damages. *GSB Contractors, Inc.,* 179 S.W.3d at 541-42. The distinction between the two is as follows:

> As a general rule, the measure of damages is the cost of correcting the defects or completing omissions, rather than the difference in value between what ought to have been done in the performance of the contract and what has been done, where the correction or completion would not involve unreasonable destruction of the work done by the contractor and the cost thereof would not be grossly disproportionate to the results to be obtained. On the other hand, the courts generally adhere to the view that if a builder or contractor has not fully performed the terms of the construction agreement, but to repair the defects or omissions would require a substantial tearing down and rebuilding of the structure, the measure of damages is the difference in value between the work if it had been performed in accordance with the contract and that which was actually done, or (as it sometimes said) the difference between the value of the defective structure and that of the structure if properly completed.

*Edenfield v. Woodlawn Manor, Inc.*, 462 S.W.2d 237, 241 (Tenn. Ct. App. 1970). Thus, "[a]s a general rule, the measure of damages for defects and omissions in the performance of a construction contract is the reasonable cost of the required repairs." *GSB Contractors*, 179 S.W.3d at 543 (citing *Estate of Jessee v. White*, 633 S.W. 2d 767 (Tenn. Ct. App. 1982)). If the defects in workmanship are so substantial that the performance of the contract made by the defendant is worthless, the contractor must pay the other party the cost of having the job redone. 22 Am. Jur. 2d *Damages* § 68.

Centimark neither raised the reasonableness of the damages amount as an issue on appeal nor introduced any evidence or testimony that the $220,374.96 amount was not reasonable. It argues, however, in its brief concerning the Rodriguez estimate that the damages amount was unreasonable.

As noted by Maszera, the Witt offer of $220,374.96, provided two years after Centimark's offer, was only $10,844.96 more than Centimark's original offer. Significantly, Centimark failed to object to the reasonableness of the damages, failed to cross-examine Mr. Witt as to the reasonableness or lack thereof of his $220,374.96 offer to Maszera, and also failed to present rebuttal evidence that the damages amount was unreasonable. The $10,844.96 amount constitutes only a 5.18% difference between the two offers. We give the trial court's determinations relating to the weight and credibility of Witt's testimony great deference on appeal. *See Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). We conclude the evidence does not preponderate against the trial court's finding that Maszera suffered damages in the amount of $220,374.96.

**D.**

Maszera appeals the trial court's findings dismissing the claims against Centimark under the TCPA. It requests we reverse the trial court's holding and conclude the court erred in failing to find a wanton and willful violation of the TCPA based upon Centimark misrepresenting to Mr. Maszera – in order to induce him to contract – that it would only use experienced roofers and would provide him with a manufacturer's warranty.

In its counter-complaint, Maszera's contention regarding deceptive business practices reads as follows:

> Centimark has engaged in deceptive business practice where it has represented that it could perform the work, accepted over $150,000 in payment and failed to complete[] the work as represented, filed a wrongful lien and sought attachment to the property to be sold in satisfaction of its lawsuit, and billed Maszera Company for work and service calls that were clearly part of the labor and materials warranty necessary to repair its defective and negligent construction. Counter-Plaintiff should be awarded all actual damages, treble damages and attorney's fees as proven at trial.

> Centimark has violated the provisions of the Tennessee Materialmen and Mechanics' (Construction) Lien statutes by including amounts in said lien and in the resulting lawsuit which are not due Plaintiff. Counter-Plaintiff is therefore entitled to damages and attorneys' fees incurred as a result of defendant said wrongful and improper lien.

In its memorandum opinion, the trial court discussed the deceptive business practices issues raised by Maszera:

> [Mr. Hilton] testified that the proposal and contract were emailed to Mr. Maszera in New Jersey. However, this was done by Eric Heath who is currently in Peru. Mr. Hilton obviously had no personal knowledge of what Mr. Heath did. He did testify though that Mr. Maszera signed one page of the contract and faxed it back to Centimark. He further testified that a sample warranty was part of the documents emailed to Defendant on May 4, 2011. He also stated that warranty samples . . . always go out with every proposal.

\* \* \*

-27-

. . . [Danny Maszera] stated that his initial contact with the Plaintiff was through Eric Heath. He stated Mr. Heath represented that there would be a fifteen year labor and material warranty. He says that he was told there would be a manufacturer's warranty on the material. He testified he would not have contracted for a private label warranty such as the one offered by Centimark.

He further states he was told there would be no subcontractors on the job. According to him, it was represented that Centimark would use only qualified roofers and he would not have hired them had he known they would use employees with no experience.

He stated that Eric Heath specifically told him he would receive a manufacturer's warranty. He also stated that Sherman Gask[ins] told him he did have a manufacturer's warranty, however, he never received the warranty but only a letter from Versico.

He maintained that he never received a proposal from Eric Heath. He stated that he received two pages of the contract when it was presented to him and he never saw the balance of seven to eight other pages that were purportedly part of the proposal. He acknowledged that Exh. 20 was an email from Eric Heath listing attachments including a proposal. He still maintains he never received the proposal.

* * *

He claims that the lien is improper and it has prevented him from refinancing the existing mortgage on the building. He states this has prevented him from making needed renovation to bring in a major tenant.

* * *

. . . [Maszera] says that [Centimark] engaged in deceptive business practices when it represented it could perform the work. Further, it is alleged that it was a deceptive business [practice] to fail to complete the work as represented. The third so called deceptive business practice is alleged to have been the filing of a wrongful lien. Fourth, [Maszera] says it was deceptive for Centimark to bill for work and service calls that were part of the labor and materials warrantied.

* * *

-28-

. . .**There is nothing false or deceptive about Centimark's representation that it could perform this job. The fact that on this occasion it did so in a negligent manner or failed to do so in a workmanlike manner does not prove the company was incapable of doing this particular job.**

[Maszera] says that Centimark failed to complete the work as represented. **There is no specific testimony about what Centimark represented that it would do but failed to do. There is no testimony that Centimark failed to install what they promised. The evidence is that i[t] simply failed to do so in a workmanlike manner.**

At the time the lien was filed, there was ongoing controversy about the cause of the continuing leaks. Centimark was owed in excess of $50,000. The lien was recorded on November 2, 2011, well before the parties reached an impasse. **The Court finds nothing unfair or deceptive about [Centimark] attempting to assert the lien in an effort to collect what it thought was a valid debt, particularly at the time the lien was filed.**

Next, [Maszera] complains it was billed for repair work in 2012. The uncontroverted testimony is that even though Centimark billed for repairs, there has been no effort to collect and these were not part of this suit. **Tenn. Code Ann. § 47-18-109 provides for a private right of action by any person who suffers from ascertainable loss of money or property as a result of the use or employment by another person of an unfair or deceptive act or practice as described in Tenn. Code Ann. 47-18-104(b). [Maszera] did not cite that code section nor did it identify any of the fifty-one unfair or deceptive acts contained therein as being the basis for its claims.** Nevertheless, it is clear from the testimony that [Maszera] has not paid those invoice repairs, nor did [Centimark] seek to collect those in this case. Therefore, the Court concludes that [Maszera] suffered no ascertainable loss as a result of that billing.

Maszera argues the court erred in finding that no specific testimony was presented about what Centimark represented it could do but failed to do. According to Maszera, it introduced two specific representations made by Centimark which were false: (1) Centimark represented that it would use only qualified, experienced roofers who were its own employees on the job when it actually used a crew of laborers most of whom had never been on a roof before and (2) Centimark represented that it would obtain and provide Maszera a manufacturer's warranty when it actually provided Maszera a letter, not a warranty.

-29-

As noted by the trial court, Maszera did not plead or cite to a specific code section of the TCPA or identify which particular act or practice in section 47-18-104(b) on which it was relying. The contract did not provide that the parties agreed to a "Manufacturer's" warranty. It reflected an agreement to a "15 year labor and material" warranty. The contract further denoted that the workers to be used would be "[a]ll Centimark Employees." Both Hilton and Gaskins testified that the workers used were Centimark employees. Significantly, the trial court found "[t]here is nothing false or deceptive about Centimark's representation that it could perform this job." In this case, "it did so in a negligent manner or failed to do so in a workmanlike manner . . . ." We conclude that the evidence does not preponderate against the trial court's factual finding that Centimark engaged in no deceptive business practices.

**E.**

Maszera contends that it is entitled to costs and attorney's fees incurred in defending this appeal pursuant to section 27-1-122 of the Tennessee Code Annotated, which provides:

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include, but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

Tenn. Code Ann. § 27-1-122. Maszera contends all issues raised by Centimark were frivolous, misleading, and false.

We must apply this statute strictly so that we do not discourage legitimate appeals. *Davis v. Gulf Ins. Grp.*, 546 S.W.2d 583, 586 (Tenn. 1977). "An appeal is deemed frivolous if it is devoid of merit or if it has no reasonable chance of success." *Wakefield v. Longmire*, 54 S.W.3d 300, 304 (Tenn. Ct. App. 2001). The award of damages for the filing of a frivolous appeal lies within the sound discretion of this court. *Banks v. St. Francis Hosp.*, 697 S.W.2d 340, 341 (Tenn. 1985).

We do not find this appeal so devoid of merit so as to warrant the award of damages under the statute. Accordingly, we deny Maszera's request for damages under the statute.

**V. CONCLUSION**

The judgment of the trial court is affirmed in its totality, and the case is remanded for enforcement of the Court's judgment and collection of costs assessed below. Costs of the

appeal are assessed to the appellant, Centimark Corporation.

_____

JOHN W. McCLARTY, JUDGE